UNITED STATES *v.* HOLLIDAY.

SAME *v.* HAAS.

1. The 12th section of the Judiciary Act of 1789, which gives to the Circuit Courts concurrent jurisdiction of all crimes and offences cognizable in the District Courts, is prospective, and embraces all offences the jurisdiction of which is vested in the District Courts by subsequent statutes.

2. Therefore the Circuit Courts have jurisdiction of the offence of selling ardent spirits to an Indian, under the act of February 12, 1862, although by that act the jurisdiction is vested only in the District Court.

3. By that act Congress intended to make it penal to sell spirituous liquor to an Indian under charge of an Indian agent, although it was sold outside of any Indian reservation and within the limits of a State.

4. The act aforesaid is constitutional, and is based upon the power of Congress to regulate commerce with the Indian tribes.

5 This power extends to the regulation of commerce with the Indian tribes and with the individual members of such tribes, though the traffic and the Indian with whom it is carried on are wholly within the territorial limits of a State.

6. Whether any particular class of Indians are still to be regarded as a tribe, or have ceased to hold the tribal relation, is primarily a question for the political departments of the government, and if they have decided it, this court will follow their lead.

7. No State can by either its constitution or other legislation withdraw the Indians within its limits from the operation of the laws of Congress regulating trade with them; notwithstanding any rights it may confer on such Indians as electors or citizens.

THESE were indictments, independent of each other, for violations of the act of Congress of February 13, 1862,*

* 12 Stat. at Large, 339.

which declares that if any person shall sell any spirituous liquors " to any *Indian* under the charge of any Indian superintendent or Indian agent appointed by the United States, he shall, on conviction thereof before the proper *District* Court of the United States," be fined and imprisoned.

This act of 1862 was amendatory of an act of June 30, 1834,* declaring that if any person sold liquor to an Indian in *the Indian country* he should forfeit five hundred dollars.

These indictments were both in *District* Courts of the United States—the one against Haas in the District Court for Minnesota (there not being at the time of the indictment any *Circuit* Court as yet established in Minnesota), and that against Holliday in the District Court for Michigan,— and under the act of August 8, 1846,† authorizing the remission of indictments from the District to the Circuit Courts, they were both removed into the *Circuit* Courts; the case of Haas, after he had been convicted of the offence charged and while a motion in arrest of judgment was pending and undetermined in the *District* Court.

### In Haas's Case,

The indictment charged that the defendant had sold the liquor to a Winnebago Indian, in the State of Minnesota, under the charge of an Indian agent of the United States; but it did not allege that the *locus in quo* was within the reservation belonging to *the Winnebago tribe, or within any Indian reservation, or within the Indian country.*

Upon this indictment the judges of the Circuit Court were divided in opinion on the questions:

1. Whether, under the act of February 13, 1862, the offence for which the defendant is indicted was one of which the *Circuit* Court could have original jurisdiction?

2. Whether, under the facts above stated, *any* court of the United States had jurisdiction of the offence?

---

* 4 Stat. at Large, 732.                    † 9 Id. 78.

### IN HOLLIDAY'S CASE,

The indictment charged the defendant with selling liquor, in Gratiot County, Michigan, to one Otibsko, an Indian under the charge of an Indian agent appointed by the United States.

The plea alleged that Gratiot County was *an organized county of the State of Michigan; that it was not within the Indian country; that no Indian reservation existed within it;* that Otibsko was one of the Chippewa Indians mentioned in certain treaties which were referred to; that Otibsko accepted lands in Michigan, and entered into possession of them under a certificate from the United States; that the tribal organization of the said Chippewa Indians was dissolved by one of the treaties, except in so far as it was necessary to preserve it for the purposes of the same; and that Otibsko had voted at elections for county and town officers.

The plea set forth also certain provisions of the constitution and laws of Michigan which confer political rights upon civilized male inhabitants of Indian descent, natives of the United States and not members of any tribes, and also judicial rights and privileges upon all Indians.

The government, by replication admitting the truth of the matters contained in the plea, alleged that, pursuant to the existing treaties with the said Chippewas, and the regulations and practice of the Interior Department and Indian Bureau, the chiefs and head men of the said Chippewas continued to be the representatives of the tribe; that the Indian agent for Michigan was required to deal with the said chiefs and head men of the said Chippewas as such, and to take the receipts of such chiefs and head men for money and property delivered to the said Chippewas under the provisions of the treaties.

And alleged further, that the said Otibsko recognized and acknowledged the chiefs and head men of the Chippewas of Saginaw, and resided with the said Indians on the lands in Isabella County, selected by them under the treaty of 1855; and that the Indian agent of the United States annually

distributed a sum of money and treaty property for the benefit of the said Otibsko.

On this state of facts the Circuit Court was divided on the following points:.

1. Whether the act of Congress, of February, 1862, does by proper construction extend to a sale of liquor, such as is charged in the indictment, under the circumstances stated in the plea and replication?

2. Whether, if construed to so extend, Congress has the constitutional right to so enact?

3. Whether, under the circumstances stated in the plea and replication, the Indian named can be considered as under the charge of an Indian agent within the meaning of the act?

4. Whether, upon the facts stated in the plea and replication, the said Otibsko was a civilized Indian, not a member of any tribe within the meaning of the constitution of Michigan, and whether he was a citizen of the State of Michigan?

5. Whether the provisions of the constitution and laws of the State of Michigan, stated in the plea of the defendant, were, under all the facts and circumstances stated in said plea and replication, and, under the constitution, the said treaties and act of Congress of 1862, a bar to said indictment?

The record in this case showed that the Secretary of the Interior and the Commissioner of Indian Affairs had decided that it was necessary, in order to carry into effect the provisions of the treaty referred to and set up by Holliday, that the tribal organization should be preserved.

In both cases the questions were now, by certificate of division, here.

*Mr. Romeyn, for Holliday; no counsel appearing for Haas:* The cases in many features are alike. To some extent, the argument for one serves for both; though the first question certified in Haas's case does not arise in Holliday's.

As respects Holliday the question is, whether the United States can punish, as a criminal offence, the selling of liquor to an Indian who is connected with a tribal organization only so far as to receive his allowance from the United States,

through the chief or head man? who is a land-owner in his own individual right, and a tax-payer in one of the States of the Union; when the liquor was sold, not on an Indian reserve, but in an organized county of a State; a district as exclusively under the jurisdiction of the State as the city of New York is under the jurisdiction of the State of New York. If so, then if the liquor had been sold to this Indian at the Astor House in New York, the proprietors of that house would be liable, on the same principles, and to the same extent as this defendant.

I. On every principle, the act of 1862 is to receive a *strict* construction. It is a penal act. It is of doubtful constitutionality.

No violence is done to the *language* of the statute, by confining its operation to Indians under the charge of an agent *within the Indian country;* for it was the evident *policy* of the act to protect the Indian, *within the Indian country;* and in addition, that policy is sufficiently sustained by the construction that the *introduction* of liquors into the Indian country shall be illegal.

Suppose that a civilized, educated Indian, a citizen of another State, should accept a glass of wine at a military post; would that be an offence under this act? We should think not.

II. If the act of 1862 be so construed as to embrace this charge, under the admitted facts of the case, then its enactments are beyond the powers of Congress, in conflict with the rights of the State, and are so far void.

As the offence was not committed in any place within the *exclusive* jurisdiction of the United States, the right of Congress to legislate for its punishment can be founded only on the notion that it was an offence against Federal sovereignty. But Congress has never claimed, and cannot lawfully exercise the power of legislating for Indians, except as *tribes* or *quasi* domestic nations. When they lose this relation and character, and become citizens of a State, or as individuals become separated from their *ordinary* tribal connections, they pass from the jurisdiction of the United States. The

limits of the agency are established, as all know, by tribes or geographical boundaries. The general duty of the agent is to manage and superintend the *intercourse with* the Indians. This assumes their separate and social condition.

The facts show that, in the case of Otibsko, to whom in Holliday's case the liquor is said to have been sold, the tribal organization was, in fact, dissolved. The lands given to the Chippeways, it is plain, were owned in severalty; and all that remained of the tribal association was connected with the convenience of paying annuities. This Indian, moreover, became a citizen of the State of Michigan.

Conceding, for the sake of the argument, that the Indian was a member of a subsisting tribe, and under the charge of an Indian agent; still, *after he came within the limits of the State,* away from the Indian country, or any Indian reservation, he became subject to the laws of the State, and it was incompetent for the United States to take cognizance of the act charged, and to punish it as a crime against the Federal government. The whole subject of the regulation of the use and sale of liquors, within the State, and away from Indian reservations, is a matter for the State, in the exercise of its police powers. The State of Michigan has exercised this power, and prescribed the penalty, and the offence was within the jurisdiction of that State.*

This legislation, as construed by the government in this case, cannot be sustained under the power of Congress to regulate commerce with foreign nations, and among the several States, and with the Indian tribes; for the act of 1862 is not, in any way, a regulation of commercial intercourse.

After a thorough argument, *contra, by Mr. Assistant Attorney-General Ashton,* who went into the whole policy of the government as respects sales of liquor to the Indians, setting forth the statutes regarding them, and the decisions which bore upon them,

---

* United States *v.* Beavans, 3 Wheaton, 336.

Mr. Justice MILLER delivered the opinion of the court.*

The questions propounded to this court in the two cases have a close relation to each other, and will be disposed of in one opinion.

The first question on which the judges divided in the case against Haas is, "whether, under the act of February 13, 1862, the offence for which the defendant is indicted was one of which the Circuit Court could have original jurisdiction."

Previous to the act of July 15, 1862, no Circuit Courts existed in the districts of Texas, Florida, Wisconsin, Minnesota, Iowa, and Kansas, but the District Courts in those districts exercised the powers of Circuit Courts. It was during this time that Haas was indicted and convicted; and a motion in arrest of judgment was pending and undetermined when that act went into effect. That act, by its own terms, transferred to the Circuit Courts which it created—one of which was in the District of Minnesota—all causes, civil or criminal, which might have been brought, and could have been originally cognizable in a Circuit Court. If, then, the offence for which Haas was indicted was one which could have been originally cognizable in a Circuit Court, it was properly in that court for final determination; otherwise it was not.

The act under which the indictment was found says, that if any person shall commit the offence therein described, "such person shall, on conviction before the proper District Court of the United States, be imprisoned," &c.

So far as the act itself provides a court for its enforcement it is the District Court, and not the Circuit Court.

An examination, however, of the several acts, which define generally the relative jurisdiction of the District and Circuit Courts of the United States, leaves no doubt that, in regard to all crimes and offences, it was intended to make the jurisdiction concurrent, except in cases where the punishment is death. In that class of offences the jurisdiction

* Nelson, J., not sitting, having been indisposed.

is exclusive in the Circuit Courts. The present offence, however, is created after all of those acts were passed, and the law defining it only confers jurisdiction on the District Court. Can the statutes, or any of them which give the Circuit Courts concurrent jurisdiction of offences cognizable in the District Courts, be held to have a prospective operation in such case as the present?

The 12th section of the Judiciary Act, which created both the Circuit and District Courts, says of the former, they " shall have exclusive cognizance of all crimes and offences cognizable under the authority of the United States, except where this act otherwise provides, or the laws of the United States shall otherwise direct, and concurrent jurisdiction with the District Courts of crimes and offences cognizable therein."

This provision has distinct reference in its first clause to cases of which the Circuit Courts shall have exclusive jurisdiction, and, in its latter clause, to cases in which they shall have concurrent jurisdiction with the District Courts. The former include all crimes and offences where some statute does not provide the contrary. The latter include all crimes and offences cognizable in the District Courts.

The Judiciary Act of 1789, of which these provisions constitute a part, is the one which, for the first time under our Federal Constitution, created the courts which were to exercise the judicial function of the government. The powers conferred by that act on the several courts which it created, and the lines by which it divided the powers of those courts from each other, and limited the powers of all of them under the Constitution, were intended to provide a general system for the administration of such powers as the Constitution authorized the Federal courts to exercise. The wisdom and forethought with which it was drawn have been the admiration of succeeding generations. And so well was it done that it remains to the present day, with a few unimportant changes, the foundation of our system of judicature, and the law which confers, governs, controls, and limits the powers

of all the Federal courts, except the Supreme Court, and which largely regulates the exercise of its powers.

It cannot be supposed, under these circumstances, that in giving to the Circuit Courts jurisdiction of all crimes and offences cognizable in the District Courts, it was intended to limit the grant to such cases as were then cognizable in those courts. In fact, there was, at the time this statute was passed, no such thing as an offence against the United States, unless it was treason, as defined in the Constitution. It has been decided that no common law crime or offence is cognizable in the Federal courts. The Judiciary Act organizing the courts was passed before there was any statute defining or punishing any offence under authority of the United States. This clause, then, giving the Circuit Courts concurrent jurisdiction in all cases of crime cognizable in the District Courts, must, of necessity, have had reference to such statutes as should thereafter define offences to be punished in the District Courts.

The offence, then, for which Haas was indicted, although declared by that act to be cognizable in the District Courts, was, by virtue of the act of 1789, also cognizable in the Circuit Courts.

The second question in that case is this: whether, under the facts above stated, any court of the United States had jurisdiction of the offence?

The facts referred to are, concisely, that spirituous liquor was sold within the territorial limits of the State of Minnesota and without any Indian reservation, to an Indian of the Winnebago tribe, under the charge of the United States Indian agent for said tribe.

It is denied by the defendant that the act of Congress was intended to apply to such a case; and, if it was, it is denied that it can be so applied under the Constitution of the United States. On the first proposition the ground taken is, that the policy of the act, and its reasonable construction, limit its operation to the Indian country, or to reservations inhabited by Indian tribes. The policy of the act is the protection of those Indians who are, by treaty or otherwise,

under the pupilage of the government, from the debasing influence of the use of spirits; and it is not easy to perceive why that policy should not require their preservation from this, to them, destructive poison, when they are outside of a reservation, as well as within it. The evil effects are the same in both cases.

But the act of 1862 is an amendment to the 20th section of the act of June 30, 1834, and, if we observe what the amendment is, all doubt on this question is removed. The first act declared that if any person sold spirituous liquor to an Indian *in the Indian country* he should forfeit five hundred dollars. The amended act punishes any person who shall sell to an Indian under charge of an Indian agent, or superintendent, appointed by the United States. The limitation to the Indian country is stricken out, and that requiring the Indian to be under charge of an agent or superintendent is substituted. It cannot be doubted that the purpose of the amendment was to remove the restriction of the act to the Indian country, and to make parties liable if they sold to Indians under the charge of a superintendent or agent, wherever they might be.

It is next asserted that if the act be so construed it is without any constitutional authority in its application to the case before us.

We are not furnished with any argument by either of the defendants on this branch of the subject, and may not therefore be able to state with entire accuracy the position assumed. But we understand it to be substantially this: that so far as the act is intended to operate as a police regulation to enforce good morals within the limits of a State of the Union, that power belongs exclusively to the State, and there is no warrant in the Constitution for its exercise by Congress. If it is an attempt to regulate commerce, then the commerce here regulated is a commerce wholly within the State, among its own inhabitants or citizens, and is not within the powers conferred on Congress by the commercial clause.

The act in question, although it may partake of some

of the qualities of those acts passed by State legislatures, which have been referred to the police powers of the States, is, we think, still more clearly entitled to be called a regulation of commerce. " Commerce," says Chief Justice Marshall, in the opinion in *Gibbons* v. *Ogden,* to which we so often turn with profit when this clause of the Constitution is under consideration, " commerce undoubtedly is traffic, but it is something more; it is intercourse." The law before us professes to regulate traffic and intercourse with the Indian tribes. It manifestly does both. It relates to buying and selling and exchanging commodities, which is the essence of all commerce, and it regulates the intercourse between the citizens of the United States and those tribes, which is another branch of commerce, and a very important one.

If the act under consideration is a regulation of commerce, as it undoubtedly is, does it regulate that kind of commerce which is placed within the control of Congress by the Constitution? The words of that instrument are: " Congress shall have power to regulate commerce with foreign nations, and among the several States, and with the Indian tribes." Commerce with foreign nations, without doubt, means commerce between citizens of the United States and citizens or subjects of foreign governments, as individuals. And so commerce with the Indian tribes, means commerce with the individuals composing those tribes. The act before us describes this precise kind of traffic or commerce, and, therefore, comes within the terms of the constitutional provision.

Is there anything in the fact that this power is to be exercised within the limits of a State, which renders the act regulating it unconstitutional?

In the same opinion to which we have just before referred, Judge Marshall, in speaking of the power to regulate commerce with foreign states, says, " The power does not stop at the jurisdictional limits of the several States. It would be a very useless power if it could not pass those lines." " If Congress has power to regulate it, that power must be exer-

cised wherever the subject exists." It follows from these propositions, which seem to be incontrovertible, that if commerce, or traffic, or intercourse, is carried on with an Indian tribe, or with a member of such tribe, it is subject to be regulated by Congress, although within the limits of a State. The locality of the traffic can have nothing to do with the power. The right to exercise it in reference to any Indian tribe, or any person who is a member of such tribe, is absolute, without reference to the locality of the traffic, or the locality of the tribe, or of the member of the tribe with whom it is carried on. It is not, however, intended by these remarks to imply that this clause of the Constitution authorizes Congress to regulate any other commerce, originated and ended within the limits of a single State, than commerce with the Indian tribes.

These views answer the two questions certified up in the case against Haas, and the two first questions in the case against Holliday.

The third question in Holliday's case is, whether, under the circumstances stated in the plea and replication, the Indian named can be considered as under the charge of an Indian agent, within the meaning of the act?

The substance of the facts as set out in those pleadings is, that the Indian to whom the liquor was sold had a piece of land on which he lived, and that he voted in county and town elections in Michigan, as he was authorized to do by the laws of that State; that he was still, however, so far connected with his tribe, that he lived among them, received his annuity under the treaty with the United States, and was represented in that matter by the chiefs or head men of his tribe, who received it for him; and that an agent of the government attended to this and other matters for that tribe. These are the substantial facts pleaded on both sides in this particular question, and admitted to be true; and without elaborating the matter, we are of opinion that they show the Indian to be still a member of his tribe, and under the charge of an Indian agent. Some point is made of the

dissolution of the tribe by the treaty of August 2, 1855; but that treaty requires the tribal relation to continue until 1865, for certain purposes, and those purposes are such that the tribe is under the charge of an Indian superintendent; and they justify the application of the act of 1862 to the individuals of that tribe.

Two other questions are propounded by the judges of the Circuit Court for the Eastern District of Michigan, both of which have relation to the effect of the constitution of Michigan and certain acts of the legislature of that State, in withdrawing these Indians from the influence of the act of 1862.

The facts in the case certified up with the division of opinion, show distinctly " that the Secretary of the Interior and the Commissioner of Indian Affairs have decided that it is necessary, in order to carry into effect the provisions of said treaty, that the tribal organization should be preserved." In reference to all matters of this kind, it is the rule of this court to follow the action of the executive and other political departments of the government, whose more special duty it is to determine such affairs. If by them those Indians are recognized as a tribe, this court must do the same. If they are a tribe of Indians, then, by the Constitution of the United States, they are placed, for certain purposes, within the control of the laws of Congress. This control extends, as we have already shown, to the subject of regulating the liquor traffic with them. This power residing in Congress, that body is necessarily supreme in its exercise. This has been too often decided by this court to require argument, or even reference to authority.

Neither the constitution of the State nor any act of its legislature, however formal or solemn, whatever rights it may confer on those Indians or withhold from them, can withdraw them from the influence of an act of Congress which that body has the constitutional right to pass concerning them. Any other doctrine would make the legislation of the State the supreme law of the land, instead of the Con-

stitution of the United States, and the laws and treaties made in pursuance thereof.

If authority for this proposition, in its application to the Indians, is needed, it may be found in the cases of the *Cherokee Nation* v. *The State of Georgia,** and *Worcester* v. *The State of Georgia.*†

The results to which we arrive from this examination of the law, as regards the questions certified to us, is, that both questions in the case against Haas must be answered in the affirmative; and in the case against Holliday, the first three must be answered in the affirmative, and the last two in the negative.

It is, however, proper to say, that in the fourth question in the latter case is included a query, whether the Indian, Otibsko, was a citizen of the State of Michigan?

As the views which we have advanced render this proposition immaterial to the decision of the case, the court is to be understood as expressing no opinion upon it.