DETERMINED IN

# THE SUPREME COURT

OF THE

# TERRITORY OF ARIZONA,

## JANUARY TERM, 1871.

THE UNITED STATES, APPELLANT, *v.* CERTAIN
PROPERTY, AND WILLIAM BICHARD & CO.,
RESPONDENTS.

CONGRESS HAS POWER TO REGULATE TRADE AND INTERCOURSE WITH IN-
DIAN TRIBES inhabiting any portion of the public domain of the United
States.

INDIAN COUNTRY IS PORTION OF TERRITORY INHABITED BY INDIANS whose
title has not been extinguished by the United States.

LICENSE TO ENABLE CITIZEN TO TRADE WITH INDIANS is not required ex-
cept in an Indian country.

SEC. 19 OF ACT OF CONGRESS OF 1802, ALLOWING TRADE and intercourse
with Indians living on lands surrounded by settlements of the citizens of
the United States, is in force in Arizona, because its provisions are appli-
cable to the condition of affairs existing therein.

PROPERTY OF TRADER SEIZED OUTSIDE OF INDIAN RESERVATION is not for-
feitable by reason of the fact that he has no license to trade, from an In-
dian superintendent or agent.

INDIAN RESERVATION IS CERTAIN LIMITED PORTION of our national domain,
assigned by the federal government to a tribe or tribes of Indians, to be
held by them according to the terms of the assignment.

CERTIFICATE OF PROBABLE CAUSE SHOULD NOT BE GIVEN BY COURT, where
the facts in the case show no reasonable cause for making the seizure.

THE facts are stated in the opinion.

*C. W. C. Rowell,* for the appellant.

Certificate of "probable cause" should have been granted by the court below. It is claimed by the appellant that if error existed at all in making the seizure, it arose from an improper construction of the intercourse act of 1834, and was error of law, therefore the certificate should have been granted. See Conkling's Treatise, 501, 502, 503; *United States* v. *Riddle,* 5 Cranch, 311.

It is claimed by appellant that all the territory within the United States, except that specially exempted, is, by the act of 1834, Indian country for the purposes of that act alone. See Intercourse Act of 1802, 2 Stats. at Large, 139, which specifies the boundaries of the Indian country as defined by that act, and also the act of 1834; 4 U. S. Stats. at Large, 729, which defines the lines as they now exist; also *American Fur Co.* v. *United States,* 2 Pet. 358; *Cherokee Nation* v. *State of Georgia,* 5 Pet. 1.

These cases show the status of the Indians in their relations with the government, as well as the interpretation of the act of 1802.

The case of *United States* v. *Holliday,* 3 Wall. 407, the most important case bearing upon this question since the act of 1834 was passed, settles the question of trade and intercourse with the Indians under the last-named act.

See also, Constitution of the U. S., sub. 8 of art. 3, as to rights of congress to regulate that trade.

*J. E. McCaffry,* for the respondent.

By Court, TITUS, C. J.:

This proceeding was instituted July 29, 1871, by petition and information, in the district court of the first judicial district of Arizona, for the condemnation of certain merchandise, therein described, alleged to have been forfeited and seized as such, June 20, 1871, near the reservation of the Pima and Maricopa Indians, by Capt. Frederick E. Grossman, special Indian agent, on a charge of illegal traffic with the said Indians.

On the twenty-first of October last, William Birchard & Co. were, on their petition and claim as sole owners, permitted to defend the said property from the decree of con-

demnation thus prayed for; and they having filed their bond for seven thousand dollars, the value of the property, with sufficient sureties, the case proceeded.

The property in contest, including a barrel of whisky, was alleged, in the information, to have been seized on the Indian reservation above mentioned. This allegation, however, was afterwards found to be erroneous, and was abandoned, as appears by the stipulations filed and of record in the present case; which stipulations admit the conclusions of fact on which the judgment of the court below was prayed—it being therein stated by the attorney for the United States as well as by the attorney for the claimants, "that the place of business of William Bichard & Co., wherein the goods, against which this action was brought, were seized, was and is off the limits of the described Indian reservation, very close to the southern boundary of said reserve—in fact within a few feet of the line; and that the lands outside the said Pima and Maricopa reservation are open to survey and pre-emption, including the place of seizure."

The deposition of the said Capt. Grossman referred to in the stipulations filed, was agreed in open court, on the hearing below, to be dispensed with as containing nothing but what was and is of judicial notoriety, "except that the articles alleged in the information and the said deposition mentioned as on storage shall be for the purposes of this trial considered as *in transitu* only."

It may be added as of public notoriety here, that the lands thus described in the records as "outside of the Pima and Maricopa reservation" and "including the place of seizure" have been partially surveyed, and are now occupied, cultivated, and improved, under the authority of the United States, by American and Mexican residents, either citizens, or seeking and awaiting citizenship under our laws; that the lands recently proposed to be annexed to the said reservation, alone contain, as appears from authoritative reports made by congress, twenty-five of these American and Mexican residents, and that the whole valley of the Gila river, including the place of seizure round it and outside of the reservation, is better settled with permanent residents, excluding Indians, than any other rural portion of Arizona.

A. T. REPS. I—3

The store of the claimants, where the merchandise in controversy was seized, is near the principal highway from Tucson to Fort Yuma; and it is also matter of public notoriety here that claimants carry on an active trade, not only with the residents on Gila river, but also with travelers by the said road.

On the part of the United States, it was alleged upon the hearing of this case, in the court below: First, that all the territory of the United States west of the Mississippi river, with little, if any, exception, is Indian country; second, that no one can lawfully trade therein with an Indian or Indians, without a license from some Indian superintendent or agent; and third, that the claimants William Bichard & Co. having traded with the Pima and Maricopa Indians without such license, the merchandise seized as above stated and described is forfeitable and ought to be condemned.

The district court after argument upon record of the case refused the decree of condemnation prayed for. An appeal was taken from its judgment to this court on behalf of the United States; and the errors alleged in the judgment of the court below, on the argument of the appeal, though not formally presented in this court, were the denial of the three propositions above cited, and the omission of that court to certify that there was probable cause for the seizure of the property in controversy.

It has been conceded by all in every stage of this case that congress has power to dispose of and make all useful rules and regulations respecting the territory or other property, and regulate commerce with the Indian tribes of the United States. Congress has to a considerable extent exercised both these powers.

It is not necessary to inquire whether congress has exhausted the whole of these two classes of powers, in its legislation thereupon. It is quite sufficient for the present case to determine whether or not it has passed any law which authorizes us to condemn the property in controversy. No other class of ordinary federal legislation is so full of pains, penalties, and forfeitures as that which regulates trade and intercourse with the Indians, *a posteriori*, therefore this court can not be too cautious in declaring where and to whom it applies.

Throughout this whole case the United States has relied on the congressional act of June 30, 1834, 4 U. S. Stat. at L. 729, especially its first section, as entitling it to a decree for the forfeiture of the property in controversy.

That section is as follows:

"That all that part of the United States, west of the Mississippi, and not within the states of Missouri and Louisiana, or the territory of Arkansas; and also other parts of the United States east of the Mississippi river, and not within any state, to which the Indian title has not been extinguished, for the purposes of this act (shall) be taken and deemed to be the Indian country."

This provision must be regarded as a description, by the highest legislative authority, of what an Indian country is. Its special purpose is declared, as in and by no other, to be "for the purpose of this act" itself, so it says, however, whenever and wherever it applies and extends. This declaration shows the place of operation, of every pain, of every penalty, of every forfeiture, of every license, and of every prohibition which the law authorizes concerning trade and intercourse with Indians.

And in this statute, as well as in those since enacted, the limitation Indian country, as here declared, is the place, and no other, to which all their consequences, whether lenient or severe, are applied.

A brief analysis of this provision will show us what it comprehends. Its purpose was, obviously, to declare what an Indian country should be thereafter. The limitation employed is, "to which the Indian title has not been extinguished." This was and is the badge of law to show an Indian country to all mankind. The territory, then and since, that could abide this test, was the Indian country, and no other.

Section 2 of the same act proceeds to apply this test. It is as follows: "No person shall be permitted to trade without license with any of the Indians." Where? In the Indian country.

Section 3 allows an Indian superintendent or agent to refuse license to a person of bad character because it would not be proper for him to reside—where? In the Indian country. Section 4 forfeits the goods of the man who

without license resides as a trader, or introduces goods, or trades—where? In the Indian country. Such is the limitation throughout this whole act. All its penal consequences are referred to the Indian country.

The same limitation is preserved in later acts. The act of June 14, 1858, 11 Stat. at L. 363, authorizes the marshal to employ a *posse comitatus,* not exceeding three persons, in any of the states, respectively, to assist in executing process by arresting and bringing in prisoners from the Indian country. The act of March 15, 1864, sec. 1, 13 Stat. at L. 29, makes it penal for any person to sell, exchange, give, barter, or dispose of any spirituous liquors or wine to any Indian under the charge of any Indian superintendent or agent, or to introduce the same into any Indian country.

Thus by an analysis of our laws regulating trade and intercourse with the Indians the conclusion is reached that an Indian country as declared by the first section of the act of 1834 is one "to which the Indian title has not been extinguished;" that there it is that a license is required to enable the citizen to trade with the Indians, and that in the Indian country, as thus described, apply the pains, penalties, prohibitions, and forfeitures declared by our acts regulating trade and intercourse with the Indians.

The venerable maxim of legal construction, *Expressio unius est exclusio alterius,* which thus ordains, that where in a statute one or a few of a class of particulars are enumerated, it must be taken that all the rest of this class not enumerated are intended to be excluded from its operation, impels to the conclusion that in no other than the Indian country as described by the act of 1834 is a license required to enable the citizen to trade with the Indians, and that in no other do the pains, penalties, prohibitions, and forfeitures denounced by the laws regulating trade and intercourse with the Indians, apply at all.

On this conclusion alone the condemnation prayed for in this case might be denied. The magnitude of the question involved, however, it is submitted, requires a more exhaustive examination of the law; and by a different mode of investigation, and of a different class of legal provisions, the judicial mind is carried to the same conclusions.

The act of 1834 already examined was the consummation

of more than fifty years of tentative Indian legislation, the act of 1802 of thirteen years of similar legislation, under the constitution.

The act of March 30, 1802, 2 Stat. at L. 145, provides: "Sec. 19. Nothing in this act shall be construed to prevent any trade or intercourse with Indians living on lands surrounded by settlements of the citizens of the United States."

The same provision is found in the act of July 22, 1790, 1 Stat. at L. 137, in the act of March 1, 1793, sec. 13, 1 Stat. at L. 329, and in the act of May 19, 1796, sec. 19, 1 Stat. at L. 469, which was the last act on the subject preceding that of 1802, from which the citation under immediate consideration is taken. In reference to this provision the act of 1834 thus provides in its repealing clause: "Sec. 29. That such repeal·shall not affect the intercourse act of 1802 so far as the same relates to or concerns Indian tribes east of the Mississippi river." Why, it may be asked, was this reservation in the act of 1834 made in favor of the states and citizens east of the Mississippi river? It was because they comprised great numbers of citizens settled around Indians upon lands of their own or those of the United States, which the federal government did not mean should be embarrassed, by the monopolies of license in their trade with the Indians, or others. The act of 1834 regulating trade and intercourse with the Indians is to some extent the result of the then recent cases of the *American Fur Co.* v. *The United States*, 2 Pet. 358; *Cherokee Nation* v. *The State of Georgia*, 5 Id. 1, and *Worcester* v. *The State of Georgia*, 6 Id. 547—the last of which was decided in the supreme court of the United States only two years before the passage of the act of 1834.

At the date of the act of 1834, there were but two organized territories east of the Mississippi river, Michigan and Florida. In these, however, and as well in the vast domain west of that river, large and ever-increasing communities of citizens had settled and were settling around Indian settlements on lands of their own or those of the United States; and it was to prevent these and other similar ones sure to arise from being cramped and embarrassed in their trade and intercourse, that the Indian country was by the act of

1834 circumscribed to territory "in which the Indian title had not been extinguished."

The protection and improvement of the Indians has been a cherished policy of the United States. Not less so has been the settlement of the public domain by citizens, its organization and development as territories, and their final admission into the union as states co-equal with those already there. The laws regulating trade and intercourse with the Indians are the offspring of both branches of this policy, and any construction of these laws which excludes either branch of this policy from its consideration must be vicious.

The act of 1834, sec. 29, we have seen, limited to the states east of the Mississippi river the act of 1802, sec. 19, which allowed free " trade and intercourse with Indians living on lands surrounded by settlements of the citizens of the United States." The act of 1802, though thus limited, has never been repealed. After the passage of the act of 1834 the first territory established was Wisconsin, organized April 20, 1836, and the last was Wyoming, organized July 26, 1868. In the organic act of each of the fifteen territories established since the act of 1834 will be found a provision substantially, if not literally, as follows:

"That the constitution, and the laws of the United States, which are not locally inapplicable, shall have the same force and effect in said territory as elsewhere in the United States." This is the provision on the subject in the organic act of New Mexico, which, with its legislation at the date of our organic act, was, by the second section of our organic act, made applicable to the territory of Arizona.

The only test provided, relative to the laws of the United States, is their applicability to the territory of Arizona. The laws of the United States, which are applicable to Arizona, have the same force and effect here as elsewhere. Is the nineteenth section of the act of 1802, allowing free trade to citizens of the United States settled around Indians, and limited to the east of the Mississippi by the twenty-ninth section of the act of 1834, applicable to Arizona? If so, then it must govern the present case.

Still further: The act of February 27, 1851, sec. 7, 9 Stat. at L. 587, is as follows: "All the laws now in force regu-

lating trade and intercourse with the Indian tribes, or such provisions of the same as may be applicable, shall be and the same are hereby extended over the Indian tribes in the Territories of New Mexico and Utah." By the act of August 4, 1854, sec. 1, 10 Stats. at L. 575, the territory now comprised in Arizona was annexed to New Mexico. The law regulating trade and intercourse with the Indians was, therefore, the law of Arizona, so far as applicable, for more than eight years prior to its organic act of 1863, 12 Stats. at L. 664, and would have so remained after its organization as a territory without a special provision on the subject. The question then occurs, is section 19 of the Indian intercourse act of 1802 in force in this territory? Mere inspection, it is submitted, shows it is so applicable, by all the exigencies that made it universal in 1802, and applied it east of the Mississippi river after 1834. In this territory there are settlements of citizens on lands their own, or so to become, unaffected by any Indian title, and around Indian settlements. The store of William Bichard & Co. where the controverted property was seized is in one of these citizen settlements. It can not be for the benefit of either the Indians or citizens, under such circumstances, to compel the one class to buy of some monopolist, relieved of all competition by his license, or to compel the other to purchase licenses before they can sell to an Indian or Indians, who choose to purchase where they can do so the cheapest or the best.

The conclusion, therefore, is that William Bichard & Co. required no license to enable them to trade with the Indians outside of any Indian reservation, or land unaffected by Indian title, and that the property controverted in this case, seized, as it was, on neither, is not forfeitable by reason of their not having such license. To prevent misconception, it may not be improper to state some limitations on some of the terms used above, and some of the conclusions reached.

An Indian title is one of mere occupancy, possession, or use, subject to the right of pre-emption in the United States. An Indian country is a portion of territory subject to an Indian title, inhabited by Indians. A mere solitude, or a country without Indians, could hardly be considered an In-

dian country, even if their title, which is merely possessory, could survive the absolute absence of its beneficiaries. An Indian reservation may be defined to be a certain limited portion of our national domain, assigned by the federal government to a tribe or tribes of Indians, or some part or parts of the same, to be held by them according to the terms of the assignment.

An Indian reservation and an Indian country are so far legal equivalents that the laws of the United States regulating trade and intercourse with the Indians apply alike to both. Licenses to trade in either are grantable by an Indian superintendent, agent, or subagent.

The act of March 15, 1864, sec. 1, 13 Stat. at L. 29, makes it an offense equally penal, to sell, exchange, give, barter, or dispose of any spirituous liquors, or wines, to any Indian under the charge of any Indian superintendent or Indian agent appointed by the United States, or to introduce the same into the Indian country. This conclusion is supported by the following cases: *The United States* v. *The American Fur Co.*, 2 Pet. 358; *The United States* v. *Holliday,* and *The United States* v. *Haas,* 3 Wall. 407.

To enable a person to buy or sell the live-stock of an Indian beyond the Indian country or an Indian reservation, a license is necessary. No license can anywhere legalize selling liquor to Indians. *United States* v. *Holliday* and *United States* v. *Haas,* 3 Wall. 407.

License can not authorize the purchase, by one not an Indian, of the arms, or clothing, or implements of labor, or domestic utensils of an Indian, or Indians. It is not pretended or alleged that the claimants in the present case, or any of them, have sold or offered to sell liquor to the Indians, or that they have infringed any of the other provisions of our Indian intercourse laws, or that they have indulged in any unconscionable practices with the Indians, or with others. On the contrary, it is a matter of public notoriety here that they have done much to advance agriculture among the Indians and in the neighboring settlements by the importation and distribution of seeds, as well as by other similar services.

The certificate of probable cause, in this case, was withheld by the judge of the court below because nothing ap-

peared in the case to show any probable cause for the seizure of the property in controversy.

By the act of congress concerning frauds on the revenue of March 2, 1799, 1 Stat. at L. 696, it is provided, sec. 89, that in prosecutions for seizures under that act, " if it shall appear to the court, before whom such prosecution shall be tried, that there was reasonable cause for such seizure, the said court shall cause a proper certificate, or entry, to be made thereof," etc. If no probable cause appears in any case, such as this, for the seizure of the property in controversy, the judge is not justifiable in making such certificate, or entry. No such cause appearing in the present case, the certificate was properly omitted.

Nothing appearing in this case to show that the property in controversy was at any time within an Indian reservation or in an Indian country, or that there was any probable cause for the seizure of the said property, or that the claimants have, in any particular, infringed the laws of the United States regulating trade and intercourse with the Indians, or any of the said laws, the decree of the district court of the first judicial district of Arizona, made in this case, is hereby affirmed, and the certificate of probable cause is refused.

TWEED, J., concurred.

REAVIS, J., delivered the following dissenting opinion:

I regret that I am unable to concur with the majority of the court in the opinion just read, and I proceed to give my reasons for such dissent. The grave importance of the subject-matter of the cause at bar, in my judgment, demands the most careful examination possible, to the end that a just conclusion may be arrived at in the premises touching the legal rights of the parties interested, and to be affected by the determination of the questions at issue. In the month of June, 1871, the agent appointed by the government for the confederate tribes of Pima and Maricopa Indians seized the goods in question, which are claimed by William Bichard & Co., for an alleged violation of the intercourse laws of the United States regulating trade and commerce with the Indian tribes. The information filed in the court below

recites, among other things, that the illicit trade with the Indians was and had been carried on by the claimants on the reservation set apart for the tribes mentioned; but the stipulations of counsel upon which the case comes into this court disclose the fact that claimants' place of business was off, but very near to, say a few feet from, the southern boundary of the reservation.

There is nothing in the record, however, to show that the claimants knew before the date of the seizure that their storehouse stood on the outside of the reservation boundary, nor does it appear that they became aware of its exact locality until a survey of the original lines of the reservation was had at their own instance, after the seizure had been made.

But this is not a material question for the purposes of this inquiry, and I pass it by for the present. The points decided by the majority of the court, as I have been able to gather them from the opinion of the chief justice who delivered the judgment of the court, are substantially:

1. That the seizure of the goods of claimants was unlawful and unauthorized, for the reason that the place where they were stored and kept was outside of the Indian reservation.

2. That the act of 1834, in its operation, is limited to that portion of the public domain of the United States where the Indian title has not been extinguished.

3. That an Indian reservation and an Indian country " are so far legal equivalents that the laws of the United States regulating trade and intercourse with the Indians apply alike to both." In other words, for the purposes of the intercourse laws mentioned, it is Indian country on the inside of the reservation lines, and not such on the outside; and that, whereas it would be a violation of the act of 1834 to trade with the Pima and Maricopa Indians on the inside of the lines of their reservation without a license, it would not be if the trade with the same Indians was had on the outside.

4. That the intercourse act of 1802 is in full force in this territory, and especially the nineteenth section thereof, allowing free trade and intercourse between Indians on a reservation' and citizens settled on lands around them.

5. That William Bichard & Co. require no license to trade with the outside of any Indian reservation on land unaffected by Indian title, and that the property seized is not forfeitable on account of their omission to obtain one to trade with the Indians.

6. That the certificate of probable cause was properly withheld, because nothing appeared in the case to show any probable cause for the seizure of the property.

The foregoing propositions furnished the premises from which the conclusions of the court appear to be drawn, but I shall not consider them exactly in the order I have mentioned them.

It is nowhere denied that congress has the power under the constitution to regulate trade and intercourse with the Indian tribes inhabiting any portion of the public domain of the United States; nor is it denied that this power has been exercised to the extent necessary to meet the exigencies of the relative situation and condition of the government and the Indians every year since the adoption of the constitution. The faith of the government has always been pledged for the protection of those tribes with whom it has entered into treaty stipulations, or one to whom its intercourse laws have been extended, regulating trade and commerce therewith.

In the case of the *Cherokee Nation* v. *State of Georgia*, Chief Justice Marshall, who delivered the opinion of the court, held that an Indian tribe or nation within the United States is not a foreign state "within the meaning of the second section of the third article of the constitution." In the same opinion the learned jurist held that the Indians were in a state of pupilage. "Their relation to the United States resembles that of a ward to his guardian. They look to our government for protection, appeal to it for relief to their wants, and address the president as their great father." It therefore follows that the relation of these tribes to the general government is marked by "peculiar distinctions," in the regulation of trade and intercourse, "which exist nowhere else." The first section of the intercourse act of 1834 defines what was known as the Indian country at that day, west of the Mississippi river. That designation, with the exception of the states of Missouri, Louisiana, and the terri-

tory of Arkansas, comprehended the whole of the possessions of the United States west of the Mississippi.

The territory over which that law was to have its operation had been acquired by the United States from the republic of France by treaty of cession at Paris, April 30, 1803, the sixth article of which treaty provides: "That the United States promises to execute such treaties and articles as may have been agreed between Spain and the tribes and nations of Indians, until by mutual consent of the United States and the said tribes or nations other suitable articles shall have been agreed upon." The act of 1834, and all subsequent treaties made with the Indian tribes inhabiting such territory, was enacted and made in pursuance of the treaty of cession of 1803, which practically recognized and secured to the Indians some sort of title to the soil, which the United States has from time to time extinguished by purchase under treaties for that purpose. The twenty-fourth section of the act of 1834 repealed the act of 1802 so far as its operation was concerned with reference to the Indians living west of the Mississippi river, but continued it in force over those east of it.

I can not agree with the majority of my brethren of the bench, that any subsequent legislation on the part of congress has resuscitated that act so as to make it operative everywhere within the jurisdictional limits of the United States.

The act of congress of 1851, extending all the intercourse acts, not locally inapplicable, over the Indians inhabiting the territories of New Mexico and Utah, does not by necessary implication or otherwise revive the act of 1802, for the purposes of such extension. There is nothing in the act of 1851, or any other act on the same subject, in my judgment, to indicate such an intention on the part of the national legislature. I conclude, therefore, that the act of 1834, and the acts amendatory thereof, are the only laws in force in this territory, on the subject of trade and intercourse with the Indian tribes residing herein.

That portion of the territory in which is located the Pima and Maricopa reservation was acquired from the republic of Mexico by treaty in 1854, known as the Gadsden treaty, in which no provision is made respecting any Indian tribes who might be living here at the time. So the status of all

such Indians must depend upon existing laws, in so far as the question of trade and intercourse with them is concerned. These laws have already been referred to, and the question recurs, how far are they locally applicable to the Arizona tribes, and what operation did the congress intend they should have in the matter of regulating trade and commerce with them.

There is no pretense set up that these Indians occupy an analogous position, with reference to the soil of the country here, to those who resided in the Indian country designated in the act of 1834, and the question of Indian title can have no weight in the determination of the question at issue in this case. The act of 1834 is sufficiently described in its title, viz., *"An act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontier,"* and in the first section it expressly declares, after giving a description of certain territory, that such territory so described, with the exceptions therein mentioned, "for the *purposes* of this act, be taken and deemed the Indian country." What were the purposes of that act? The question is fully answered in the title just given. The territory mentioned therein was Indian country for no other purpose than for the regulation of trade with the Indians, and its operation everywhere must be uniform to that extent. I agree with the learned chief justice who wrote the opinion of the court in this case, that we can not very well have an Indian country without the bodily presence of Indians, and where we have such Indians, whether they have submitted themselves to the control of the government, or occupy a hostile attitude thereto, the matter of trade and intercourse with them in either capacity must be regulated by the existing laws provided for the purpose. All the decisions on the subject pronounced in the supreme court of the United States agree that the various intercourse acts passed from time to time by congress have been intended to protect the Indians against fraud and deception, and to regulate trade and commerce with the various tribes upon the broadest principles of equity and justice. To that end those localities inhabited by Indian tribes have been carved into convenient districts or superintendencies, and a suitable person selected by the president of the United States for each of such dis-

tricts, who, by and with the advice and consent of the senate, is appointed to superintend the affairs of the Indians in the particular districts; and for each individual tribe an agent is selected in the same manner, and these officers must report to, and are directly under the control of, one of the political departments of the government, known as the "Department of the Interior," which is charged with the execution of all the laws having reference to Indian affairs. These officers are required to give ample bonds for the faithful performance of their duties as prescribed by law, among which is the selection of proper persons.to act as traders with the Indians, who are licensed for that purpose, and give bonds conditioned for the faithful performance of the duties imposed by law, and to obey all such rules and regulations in the premises as shall from time to time be prescribed by the head of the department referred to. There has been a superintendent of Indian affairs provided for Arizona, and there are agents for the confederate tribes of Pima and Maricopa Indians, with whom the illicit trade complained of in this cause was carried on; and these officers were in the active discharge of the duties of these several offices at the time the seizure of the goods in question was made. There were also at the same time licensed traders duly appointed and qualified to trade with these Indians. These traders are called monopolists by the learned judge who delivered the opinion of the court in this case, and he assumes that the act of 1834 was passed in consequence of the decisions in the cases of the *American Fur Co.* v. *United States, Cherokee Nation* v. *State of Georgia,* and *Worcester* v. *State of Georgia,* in none of which have I been able to find doctrines in support of the assumption. The language of the act itself makes it very clear, that while congress believes the provisions of the act of 1802 were ample for the purposes of trade and intercourse with the Indians east of the Mississippi, they were not deemed sufficient for the purpose in the case of the Indians on the west side of that river. All the states of the union at that time, except two, lay between the Mississippi river and the Atlantic ocean, and the act of 1834 was intended to operate upon those Indians inhabiting the territory mentioned in the first section thereof.

The majority of the court hold that inasmuch as the trade complained of, and the seizure of the goods in consequence thereof, all took place outside of the reservation, that *per se* the trade was not unlawful, but the seizure of the goods was.   Is it true that the government and the laws afford no protection to the Indians outside of the lines of the reservation?   Does the authority to regulate trade, traffic, or commerce extend no farther than the boundaries of such reservation ?

In the case of the *United States* v. *Holliday*, 3 Wall. 407, the supreme court said that if commerce or traffic or intercourse is carried on with an Indian tribe, or with a number of such tribes, it is subject to be regulated by congress, although within the limits of a state.   The locality of the traffic can have nothing to do with the power.   The right to exercise it in reference to any Indian tribe, or any person who is a member of such tribe, is absolute, without reference to the locality of the traffic, or the locality of the tribe, or the member of the tribe with whom it is carried on.

The same doctrine was held in the case of the *United States* v. *Haas*, 3 Wall. 407.

I have no doubt of the power of the agents of the government to prevent any person from trading with Indians under their charge, unless specially authorized by law to do so, and this, whether on or off the Indian reservation.   Whether the goods of the offender would be liable to seizure will depend upon the circumstances of the particular case, but that such agents have the power to make such seizure for a violation of the intercourse act, I have equally no doubt. In this case the certificate of "probable cause" should have been issued; its issuance is not a matter of discretion of the court, to be exercised at pleasure, and to withhold it in this case is error.   It is for the protection of an officer of the government, when acting officially in pursuance of what he conceives to be the law, or under orders from his superior officer.   In either case he is entitled to the certificate. .

For these reasons I can not concur in the opinion and judgment of the court.