In re UNITED STATES of America ex rel. C. Hobart KEITH

v.

SIOUX NATION SHOPPING CENTER et al.

Civ. No. 79–5025.

United States District Court, D. South Dakota.

April 25, 1980.

C. Hobart Keith, pro se.

Thomas H. Barnes, James H. Wilson, Rapid City, S.D., for defendants.

## MEMORANDUM OPINION

BOGUE, District Judge.

This action was brought under 25 U.S.C. § 264 against 128 defendants. Summary judgment was granted to eight of the defendants, so 120 remain. The plaintiff is a *qui tam* litigant acting under the authority of 25 U.S.C. § 201.[1]

Due to the extremely large number of defendants in this case, this court decided to sever the trials of groups of defendants. On December 14, 1979, the trial of five of the defendants was held. On February 8, 1980, an additional 22 of the defendants were tried. And finally, on April 4, 1980, a hearing was held to take additional testimony relevant to the trials which had already been held. This opinion will deal with plaintiff's claims against those 27 defendants who have been tried.

Plaintiff alleges that the defendants have violated 25 U.S.C. § 264 by trading with Indians in Indian country without the required license. Title 25, U.S.C. § 262 provides as follows:

Any person desiring to trade with the Indians on any Indian reservation shall, upon establishing the fact, to the satisfaction of the Commissioner of Indian Af-

fairs, that he is a proper person to engage in such trade, be permitted to do so under such rules and regulations as the Commissioner of Indian Affairs may prescribe for the protection of said Indians.

The relevant portion of § 264 provides:

Any person other than an Indian of the full blood who shall attempt to reside in the Indian country, or on any Indian reservation, as a trader, or to introduce goods, or to trade therein, without such license, shall forfeit all merchandise offered for sale to the Indians or found in his possession, and shall moreover be liable to a penalty of $500 . . . .

The only case dealing with 25 U.S.C. § 264 applicable to this action is *U.S. ex rel. Hornell v. One 1976 Chevrolet Station Wagon*, 585 F.2d 978 (10th Cir. 1978). Plaintiff relies almost solely on this case as support for his position. *Hornell* involved the sale of an automobile on an Indian reservation to the plaintiffs, who were Indians. This sale was held to violate 25 U.S.C. § 264 and the trial court's order dismissing plaintiff's claim for a monetary penalty under § 264 was vacated.

The facts of the *Hornell* case are as follows. Plaintiffs visited an automobile showroom operated by one of the defendants in Gallup, New Mexico, which is not located on a reservation. A salesman at the showroom waited on them and filled out a credit application for them when they expressed interest in a certain automobile. The salesman suggested the plaintiffs come back later to see if their credit had been approved. That same day the salesman obtained approval of credit and prepared a retail installment contract. The plaintiffs, however, did not return. The following day the salesman took the automobile to plaintiffs' home, which was located within the Navajo Indian Reservation in Arizona. The plaintiffs agreed to purchase the car and

---

1. All penalties which shall accrue under this title shall be sued for and recovered in an action in the nature of an action debt, in the name of the United States, before any court having jurisdiction of the same, in any State or Territory in which the defendant shall be ar-

rested or found, the one half to the use of the informer and the other half to the use of the United States, except when the prosecution shall be first instituted on behalf of the United States, in which case the whole shall be to their use.

the retail installment contract was executed at their home. On the basis of these facts, § 264 was held to apply and the automobile dealership was held subject to fine.

At this point it becomes necessary to determine if any of the defendants have traded with Indians on a reservation. If they have, it will be necessary to determine whether such defendants had the proper license to do so.

Trading has been defined in a number of ways. In *Alabama Optometric Association v. Alabama State Board of Health*, 379 F.Supp. 1332, 1335 (M.D.Ala.1974), the court stated: "Trade . . . denotes 'the purchase or barter and sale of goods, wares and merchandise . . . .' " Several other definitions are stated in *United States ex rel. Burnette v. Valandra*, 300 F.Supp. 312 (D.S.D.1969). A common thread running throughout these various definitions is that trade involves the exchange of commodities for other commodities or money. *See* 42 *Words and Phrases*, p. 216.

■ A § 264 license must be obtained by those trading with Indians on a reservation. The definitions of trading indicate that to fall under the provisions of this statute the actual exchange of goods and money or the execution of a sales contract must occur on the reservation. This view is supported by the *Hornell* case. There is no indication in that case that the mere selling of a product to an Indian beyond the boundaries of a reservation necessitates the procurement of a § 264 license. Neither is there any indication that the mere delivery to a reservation of a product already purchased by an Indian falls under § 264. The problem in *Hornell* arose when the salesman actually executed the sale on the reservation. In this Court's view, mere delivery of an article to an Indian purchaser on a reservation does not require a § 264 license. A license is required only when the actual sale of the product occurs on the reservation.

The evidence produced at the trials of December 14, 1979, and February 8, 1980, differed considerably. At the December 14, 1979 hearing representatives of the five defendants voluntarily appeared and were ex-amined by the plaintiff. The bulk of plaintiff's evidence was presented in this manner. However, at the February 8, 1979 hearing, none of the defendants was present, although they were represented by counsel. At the February 8th hearing the only testimony presented came from the plaintiff and an acquaintance of the plaintiff. This testimony was limited to reports that trucks with the names of some of the defendants on them had been seen on the reservation, that some of the defendants' products had been seen on the reservation and other similar reports. There was no evidence whatsoever that any of these 22 defendants did any trading with Indians on the reservation. Therefore, as to the 22 defendants who were tried on February 8, 1980, this Court must dismiss plaintiff's complaint.

As noted above, the situation at the December 14, 1979 trial of five of the other defendants was different. Because of the testimony of the defendants presented at that trial, it will be necessary to comment on each defendant individually.

The five defendants on trial at the December 14th hearing were Knecht Lumber Company, Kluthe and Lane Insurance Agency, Inc., Rushmore Homes, Inc., Green Star Homes, Inc., and Frank Groomes. Applying the foregoing definition of trading to these defendants' cases, this Court feels that plaintiff's complaint should be dismissed as to all of these defendants except Frank Groomes.

A representative of Knecht Lumber Company testified that his company does not sell any products on the reservation. No evidence was introduced to contradict this statement. Therefore, it was not established that Defendant Knecht Lumber Company has done any trading on the reservation so as to fall under § 264.

■ A representative of Kluthe and Lane Insurance Agency, Inc. testified that the agency has sold insurance to Indians, but that all of these sales were made in Rapid City, South Dakota, which is not part of an Indian reservation. A § 264 license is

not required for such a sale. In addition, this Court has previously granted motions for summary judgment made by several defendants who claimed they dealt only in services and that § 264 applies only to those who deal in goods. This reasoning would appear to apply to Defendant Kluthe and Lane also, since the selling of insurance would seem to involve the sale of a service rather than a good.

■ There was also no evidence regarding actual sales made on the reservation by Defendant Rushmore Homes, Inc. A representative of Rushmore Homes testified that the company sold their product to a corporation which was headquartered on a reservation. However, the sale was executed at Rapid City. Therefore, the § 264 licensing requirement does not apply as to this defendant.

As for Green Star Homes, Inc., the testimony revealed that they sold products to Indians and delivered the products to the reservation. Again, however, the evidence indicated that the sales in question were not made on the reservation and therefore § 264 does not apply as to this defendant.

■ The only defendant for which there was testimony presented that a § 264 license might be required was Frank Groomes. Groomes, a non-Indian doing business as a rancher on the reservation, testified that he has executed sales of cattle to Indians on the reservation and that he does not have a § 264 license. The testimony of Defendant Groomes would appear to indicate that Groomes is in violation of § 264 and thus, subject to a fine. There are, however, certain extenuating circumstances that must be examined before it is determined if Defendant Groomes should be fined. In order to do this, it is necessary to trace the history of governmental control of Indian trading.

Trade with Indians has been regulated in this country since the 1600s. In the 1700s and 1800s several statutes were passed which dealt with this subject. The statute with which this case is concerned was originally enacted in 1834 and subsequently amended in 1876 and 1882. These statutes regulating trade with Indians were apparently passed to protect the Indians from unscrupulous traders who sought to take advantage of them.[2] Wayne Adkison, the Administrative Manager of the Pine Ridge Indian Reservation, testified at the April 4, 1980 hearing that § 264 "was implemented for whiskey traders, gun sellers, ladies of easy virtue, or what have you. . . . ."

During congressional debates of 1876 some of the reasons for regulating trade with the Indians were discussed. According to the comments of Senator Logan, Indians were being charged prices which were considerably higher than the prices being charged for the same article elsewhere. In arguing for a type of licensing system for traders, Congressman Magninis stated that the reason for the high prices charged on the reservations was that monopolies and special privileges had been granted to traders, who abused these privileges. In an attempt to correct these abuses, the system of licensing Indian traders was established. See *Rockbridge v. Lincoln*, 449 F.2d 567 (9th Cir. 1971).

Since the passage of 25 U.S.C. § 264, the statute has not generated a great deal of litigation. It has, however, been interpreted and applied in a few cases throughout the years. See *United States v. Parton*, 132 F.2d 886 (4th Cir. 1943); *Buster v. Wright*, 135 F. 948 (8th Cir. 1905), *appeal dismissed* 203 U.S. 599, 27 S.Ct. 777, 51 L.Ed. 334 (1906); *Rider v. LaClair*, 77 Wash. 488, 138 P. 3 (1914); *Dunn v. Carter*, 30 Kan. 294, 1 P. 66 (1883); *United States v. Certain Property*, 1 Ariz. 31, 25 P. 517 (1871). Although these cases do not deal with the issues involved in this case, they do seem to indicate the viability of 25 U.S.C. § 264.

The Code of Federal Regulations also appears to indicate that § 264 is still viable. It sets out the procedures to be followed in

---

**2.** For a discussion of the history of governmental regulation of trade with Indians, *see* U.S. Department of the Interior, *Federal Indian Law* (1958), pp. 373–381; Cohen, *Handbook of Federal Indian Law* (1942), pp. 348–351.

obtaining a § 264 license. Title 25 C.F.R. § 251.1 grants to the Commissioner of Indian Affairs the sole power and authority to authorize persons to trade with Indians on a reservation. Penalties for failure to comply with the Commissioner's rules and regulations are set out in § 251.3. Furthermore, §§ 251.9, 251.11, 251.12 and 251.15 establish the procedure for obtaining, using and renewing a license. Title 25 of the Code of Federal Regulations was revised as recently as April 1, 1979, and the regulations therein remain in full force and effect today.

Title 25 U.S.C. § 264, 25 C.F.R., part 251, and the *Hornell* case would seem to clearly establish that persons wishing to trade with Indians on a reservation must obtain a license under § 264 before doing so. However, apparently the federal bureaucracy does not necessarily agree. The testimony before this Court at the April 4, 1980, hearing indicated that such licenses are almost impossible to obtain, at least in South Dakota.

As noted earlier, the testimony at the April 4th hearing came from Wayne Adkison, the Administrative Manager of the Pine Ridge Indian Reservation. Mr. Adkison is an employee of the Department of the Interior and is familiar with the Federal Traders License requirements contained in § 264.

Adkison testified that at one point, approximately four years ago, he attempted to implement the federal licensing program, but that it was such an administrative hassle that he abandoned the attempt. Public response to the attempt to enforce § 264 was decidedly unfavorable. Furthermore, Adkison discovered that his office did not even have any of the licenses available. He was forced to consider employing local high school art students to make licenses.

Adkison further testified that the license required by § 264 performs exactly the same function as permits which are presently being issued by the Oglala Sioux Tribe. He stated: "We are compounding what the tribe is already doing. We are providing a service for which there was no demand and which was alienating many people. . . ."

After the futile attempt to enforce § 264, Adkison's office decided to consider tribal licenses sufficient to meet the federal licensing requirements. In response to numerous inquiries about federal license requirements, people were told that Adkison's office was not set up to implement the program and that the purchase of a tribal permit would be sufficient. This was done despite the seemingly clear language of 25 U.S.C. § 264 and 25 C.F.R. part 251.

What we apparently have here is a situation where a federal statute has been almost completely ignored or proven to be unworkable by those designated to implement it. The § 264 license is required by federal law, but for all intents and purposes is unobtainable.

The evidence established that Defendant Groomes traded without a license in violation of § 264. However, it was also established that Groomes purchased a tribal permit in order to trade on the reservation. To fine Groomes any amount of money for failing to procure a license which cannot be obtained, would be both unfair and absurd.

Groomes apparently attempted to comply with the law by purchasing a tribal permit. It is this Court's feeling that because of the Department of the Interior's failure to implement the licensing program under § 264, where a person trading with Indians on the reservation has obtained a tribal permit, he will be held to be in substantial compliance with § 264. Since Groomes is in substantial compliance and apparently neither the plaintiff nor anybody else has been damaged by his failure to obtain a federal license, plaintiff's complaint as to Groomes should also be dismissed.

In addition to the foregoing, plaintiff may wish to present a couple of other issues to the appellate court. Section 264 provides that anyone violating the statute "shall . . . be liable to a penalty of $500." This court has heretofore stated for the record that in the event a fine is assessed under § 264, the penalty provision is not a mandatory maximum penalty and that the court has the discretion to impose a

penalty up to $500. There is no federal case on this point. The only case this Court has found dealing with the meaning of the phrase "shall be liable" is *Emerson v. Mary Lincoln Candies*, 174 Misc. 353, 20 N.Y.S.2d 570 (1940). In that case it was held that such language was mandatory and left the court no discretion in assessing a penalty. This Court, however, does not feel constrained to follow this case. It is the opinion of this Court that if Congress had intended to impose a mandatory fine it would have said so in unmistakable terms. It is inconceivable that good faith on the part of a trader in attempting to obtain the proper license could not be considered by a court— particularly in a situation such as we are confronted with here where the Department of the Interior has failed to make any licenses available. For this penalty provision to be mandatory would require language so clear as to leave room for no other reasonable construction. Such language is clearly absent here.

■ An additional issue which plaintiff may wish to present to the appellate court has been obliquely raised during the course of the trials. Initially, plaintiff requested that this Court authorize him to proceed *in forma pauperis* in the service of the summons and complaint only. This request was promptly denied because plaintiff failed to establish his indigency to the satisfaction of this Court. This is a totally discretionary matter with the trial court. The Court did, however, authorize the service of summons and complaint by special process server. The various defendants did appear in the earlier cases, but did not in the later cases. Plaintiff examined the earlier defendants but, of course, could not examine those other defendants who did not appear. Acting as his own counsel, plaintiff stated in the record in substance that he was not aware that the defendants were not required to appear personally, and when advised to the contrary, plaintiff stated that he had not sufficient funds to subpoena defendants and to pay for the expense of obtaining witnesses. This Court simply cannot be put in the position of advising an adversary in a lawsuit, but it is abundantly clear that plaintiff must have the defendants present or witnesses available if he is to even come near to proving his case. At the risk of seeming over solicitous of plaintiff's venture, this Court is considering his remarks about his indigency during the last trials as an application to the Court for authorization to have the remaining defendants served *in forma pauperis.*

Under the provisions of 28 U.S.C. § 1915 the Court may, upon the filing of a proper and sufficient affidavit by an indigent person, authorize such service of subpoenas, under certain conditions, at government expense. Alternatively, service of such subpoenas may be served by any person who is not a party and is not less than eighteen years of age. Rule 45(c) of the Federal Rules of Civil Procedure. Plaintiff, of course, under said rule is obligated to tender such person fees for one day's attendance and mileage allowed by law.

It is the finding of the Court that as to the cases already tried, plaintiff's affidavit in support of his motion for *in forma pauperis* status is insufficient in that it does not establish sufficient indigency. It is the opinion of this Court that plaintiff would have been able to pay the costs in connection with the subpoenas of defendants and witnesses for the cases already tried.

The issue of greatest concern is whether or not to allow plaintiff to subpoena defendants and witnesses *in forma pauperis* in all future trials. The trials of approximately 100 defendants remain in the Western Division of South Dakota. Approximately 100 defendants have also been sued under the same statute in the Central Division of South Dakota, and plaintiff has indicated that these defendants form only the tip of the iceberg. Under these circumstances, with the volume of cases to be tried, it can hardly be urged that plaintiff can pay the costs in connection with subpoenas for *all* defendants and witnesses under his present financial position. Obviously he cannot, but whether or not the cited statute, 28 U.S.C. § 1915, is intended to apply to the plaintiff in this type of case and under these circum-

stances must be questioned. Plaintiff has no property rights involved in this case and his liberty or civil rights are not in jeopardy. He has expressly stated that he is in it for the money under the provisions of 25 U.S.C. § 201 whereunder he would receive, as an informer, one half of all penalties obtained.

If the appellate court interprets the *in forma pauperis* statute to be limited solely to the issue of whether or not a party to a lawsuit can afford to pay certain costs in such lawsuit—without consideration of any other factors such as we have here, then they will say so promptly, I am sure. If *in forma pauperis* status is granted the rather novel situation would result wherein the United States would be financing a lawsuit for which it stands to collect a portion of any fines awarded, but where the actions of the United States are the primary reason for the assessment of any penalties. The novelty of this situation would be increased in later trials in that a number of defendants yet to be tried have brought third party complaints against the United States as a result of the failure of the United States to make licenses available.

If, however, discretion is given to the trial court to consider matters other than financial abilities of party litigants, then it is clear that the situation in this case militates against a carte blanche approval of an *in forma pauperis* status for plaintiff. Title 28 U.S.C. § 1915 states that the court "may" authorize, etc. This, standing alone, surely allows discretion.

This Court, in exercising its discretion in a field replete with complexities, hereby refuses and denies Plaintiff Keith's application for *in forma pauperis* status relative to subpoenas for defendants and witnesses.

The foregoing opinion shall constitute this Court's Findings of Fact and Conclusions of Law.