**Albert DURO, Petitioner–Appellee,**

**v.**

**Edward REINA, Chief of Police, Salt River Department of Public Safety, Salt River Pima–Maricopa Indian Community, et al., Respondents–Appellants.**

**No. 85–1718.**

United States Court of Appeals,
Ninth Circuit.

Nov. 2, 1988.

Richard B. Wilks, Phoenix, Ariz., for respondents-appellants.

John Trebon, Phoenix, Ariz., for petitioner-appellee.

Rodney B. Lewis, Sacaton, Ariz., Edward G. Maloney, Jr., Seattle, Wash., for amici curiae.

Before CHOY, SNEED and BRUNETTI, Circuit Judges.

## ORDER

Judge Choy and Judge Brunetti have voted to deny the petition for rehearing and to reject the suggestion for a rehearing en banc. Judge Sneed has voted to grant the petition for rehearing and recommends accepting the suggestion for a rehearing en banc.

The full court was advised of the suggestion for rehearing en banc. Fed.R.App.P. 35(b). A majority of the judges voted against en banc consideration. Judge Kozinski's dissent from the order denying rehearing en banc is attached.

The petition for rehearing is denied and the suggestion for a rehearing en banc is rejected.

KOZINSKI, Circuit Judge, with whom LEAVY and TROTT, Circuit Judges, join, dissenting from the order denying rehearing en banc.

In attempting to navigate what it calls "the uncharted reaches of tribal jurisdiction," *Duro v. Reina*, 851 F.2d 1136, 1139 (9th Cir.1988), a panel of our court has cast off the map and the compass. The panel's holding—that a tribal court may exercise criminal jurisdiction over Indians who are not members of the tribe—overlooks clear Supreme Court pronouncements to the contrary, is at odds with current equal protection analysis, creates an irreconcilable conflict with the Eighth Circuit and potentially subjects criminal defendants to biased tribunals. This is a serious matter deserving serious attention. I therefore respectfully dissent from the order denying rehearing en banc.

## I

Petitioner Albert Duro is a member of the Torrez–Martinez band of Mission Indians. From March 1984 to June 1984, Duro

lived on the Salt River Indian Reservation, the home of the Salt River Pima–Maricopa Indian Community, a tribe in which Duro is ineligible for membership. While on the Salt River Reservation, Duro allegedly shot and killed a fourteen year old boy. Criminal complaints against Duro were filed in both federal district court and the Salt River Pima–Maricopa Indian Community Court.

The panel holds that the tribal court has criminal jurisdiction over Duro, a member of a wholly different tribe, simply because he is an Indian. As discussed more fully below, this one-Indian-is-just-like-another-Indian approach to tribal jurisdiction is seriously misguided.

## II

### A. *Disregard of Supreme Court Authority*

The panel laments the lack of Supreme Court guidance on the question before it and is "perplexed by the [ ] ambiguities in the historical record." 851 F.2d at 1142. The panel's perplexity grows out of its failure to consider or discuss the Supreme Court cases most directly on point, its insistence on labelling relevant statements in other Supreme Court cases as dicta and its reluctance to accept the guidance clearly offered in the Supreme Court cases on which it does rely. The fact of the matter is that the Supreme Court has charted a clear course through these waters, a course that the Eighth Circuit had no difficulty

following. *Greywater v. Joshua,* 846 F.2d 486 (8th Cir.1988).

The course starts with *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), where the Court held that tribes could not exercise criminal jurisdiction over non-Indians.[1] Standing alone, *Oliphant* leaves open the possibility that tribal courts might exercise criminal jurisdiction over Indians who are not members of the forum tribe. A series of subsequent decisions have elaborated on *Oliphant,* however, effectively foreclosing this possibility.

Only two weeks after *Oliphant* the Court decided *United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). *Wheeler* raised the question whether the defendant (a member of the Navajo tribe) could be tried in federal court after the Navajo tribal court had convicted him for the same conduct. To resolve this question, the Supreme Court had to examine the source of the tribe's authority over Wheeler.[2] The Court concluded that the jurisdiction derived from the tribe's retained authority, i.e., that aspect of the tribe's sovereignty it had not given up by virtue of incorporation into the United States. In reaching this conclusion, the Court drew a sharp distinction between those sovereign powers the tribe had surrendered and those it had not:

> The areas in which such implicit divestiture of sovereignty has been held to have occurred are those involving *the rela-*

---

1. The panel correctly notes that *Oliphant* has been widely criticized. 851 F.2d at 1142 n. 5. *See* Williams, *The Algebra of Federal Indian Law: The Hard Trail of Decolonizing and Americanizing the White Man's Indian Jurisprudence,* 1987 Wis.L.Rev. 219, 267–74; Collins, *Implied Limitations on the Jurisdiction of Indian Tribes,* 54 Wash.L.Rev. 479 (1979); Barsh & Henderson, *The Betrayal:* Oliphant v. Suquamish Indian Tribe *and the Hunting of the Snark,* 63 Minn.L.Rev. 609 (1979). Yet *Oliphant* remains law and continues to be, at least in the Supreme Court's view, the progenitor of a series of tribal jurisdiction decisions. The panel may well be right in joining the chorus, 851 F.2d at 1141–42, but academic criticism, no matter how strong, cannot overrule a decision of the Supreme Court.

2. The source of the authority was crucial for double jeopardy purposes: If the tribe derived its authority from Congress, the defendant would face double jeopardy because both prosecutions would be on behalf of the same sovereign. *See Puerto Rico v. Shell Co.,* 302 U.S. 253, 264, 58 S.Ct. 167, 172, 82 L.Ed. 235 (1937) (double jeopardy clause bars successive prosecutions by federal and territorial courts because they are "creations emanating from the same sovereignty"); *Waller v. Florida,* 397 U.S. 387, 393, 90 S.Ct. 1184, 1187, 25 L.Ed.2d 435 (1970) (barring successive prosecutions by a city and by the state of which the city is a political subdivision). If the sources were different (as in the case of separate state and federal prosecutions), then the double jeopardy clause would not bar subsequent prosecution by the United States. *See Wheeler,* 435 U.S. at 329–30, 98 S.Ct. at 1089–90.

tions between an Indian tribe and non-members of the tribe .... But the powers of self-government, including the power to prescribe and enforce internal criminal laws, are of a different type. They involve only the relations among members of a tribe. Thus, they are not such powers as would necessarily be lost by virtue of a tribe's dependent status. *Id.* at 326, 98 S.Ct. at 1087 (emphasis added). Speaking precisely to the issue presented in our case, the Court stated: "And, as we have recently held, [the tribes] cannot try nonmembers in tribal courts." *Id.* (citing *Oliphant,* 435 U.S. at 191, 98 S.Ct. at 1011).

Admittedly, this last statement in *Wheeler* is dictum. But it is dictum of a most unusual and persuasive sort: It is the Supreme Court's characterization of its holding in a case it had decided only two weeks earlier. More important, when cited by the Court in support of its analysis in *Wheeler,* it is the only characterization of *Oliphant* that makes sense. As the Eighth Circuit recognized, "[t]he *Wheeler* Court's analysis distinguishing nonmember Indians from tribal members was not inadvertent. Its very analysis requires such distinction." *Greywater,* 846 F.2d at 491. If the tribe's criminal jurisdiction is derived from its power to control relations among its own members, that power cannot extend to anyone who is not a member of the tribe. The result reached by the panel in our case simply cannot be squared with *Oliphant* and *Wheeler.*[3]

But *Oliphant* and *Wheeler* were only the first manifestations of the Court's emerging theory limiting tribal jurisdiction to members of the tribe. In *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), the Court con-

sidered whether a state could impose various state taxes on cigarettes and other items sold by tribal enterprises on the reservation. The Court held that the state could properly tax sales to nonmembers of the tribe, but not sales to members. Most important, the Court addressed the issue—crucial in our case—of the status of the Indians who were not members of the tribe in question:

> [T]he mere fact that nonmembers resident on the reservation come within the definition of "Indian" for purposes of the Indian Reorganization Act of 1934, 48 Stat. 988, 25 U.S.C. § 479, does not demonstrate a congressional intent to exempt such Indians from state taxation.
>
> Nor would the imposition of Washington's tax on these purchasers contravene the principle of tribal self-government, for the simple reason that nonmembers are not constituents of the governing Tribe. *For most practical purposes those Indians stand on the same footing as non-Indians resident on the reservation.* There is no evidence that nonmembers have a say in tribal affairs or significantly share in tribal disbursements.

*Id.* at 161 100 S.Ct. at 2085 (emphasis added); *see also id.* at 187, 100 S.Ct. at 2098 (Rehnquist, J., concurring in part) ("[t]he fact that the nonmember resident happens to be an Indian by race provides no basis for distinction. The traditional immunity is not based on race, but accouterments of self-government in which a nonmember does not share"). Although the Court was discussing a tribe's immunity from taxation, not its criminal jurisdiction, the Court was clearly drawing on a broader theory of tribal sovereignty: A tribe acts as a sovereign only with respect to its own members.

---

**3.** The majority minimizes *Wheeler* by describing its use of the term "nonmember" as "indiscriminate." 851 F.2d at 1140. The fact that the Court refers to both nonmembers and non-Indians in some of its opinions does not, however, reveal sloppy thinking or the random use of language. When the Court merely describes the facts presented by *Oliphant* or other cases, it usually employs the term non-Indian. *See, e.g., Montana v. United States,* 450 U.S. 544, 565–66,

101 S.Ct. 1245, 1258–59, 67 L.Ed.2d 493 (1981); *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 153, 100 S.Ct. 2069, 2081, 65 L.Ed.2d 10 (1980). When it discusses its *rationale,* the Court repeatedly distinguishes along the line of tribal membership and not race. *See, e.g., Montana,* 450 U.S. at 563–64, 101 S.Ct. at 1257–58; *Colville,* 447 U.S. at 155–61, 100 S.Ct. at 2082–85.

The panel disregards *Colville*, just as it disregards *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), where the Court provided its most explicit statement yet as to the boundaries of tribal sovereignty. *Montana* draws a clear distinction between a tribe's power over its own members and its power over nonmembers. At issue was whether a tribe could prohibit hunting and fishing by nonmembers on reservation land not owned by the tribe. Applying the principles announced in *Wheeler*, the Court concluded that the tribe could not prohibit such activities:

> Thus, *in addition to the power to punish tribal offenders*, the Indian tribes retain their inherent power to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members. *But exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation.*

*Id.* at 564, 101 S.Ct. at 1257 (emphasis added; citations omitted). Significantly, the Court viewed its conclusion as flowing from the rationale of *Oliphant:* "Though *Oliphant* only determined inherent tribal authority in criminal matters, the principles on which it relied support the general proposition that *the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe.*" *Id.* at 565, 101 S.Ct. at 1258 (emphasis added; footnote omitted). The exercise of criminal jurisdiction is plainly an "inherent sovereign power."

As the Eighth Circuit recognized, in seeking guidance from the Supreme Court, we must do more than look at words and phrases; we must analyze concepts and principles. A sister circuit has done so and come to the conclusion that tribal courts may not assert criminal jurisdiction over Indians who are not members of the tribe. *Greywater* draws a map of the Supreme Court law on this subject, carefully highlighting all the significant landmarks. If we interpret the map differently, if we read the Supreme Court cases as charting another course, so be it. But we then have a responsibility to explain our reasoning. Dismissing some Supreme Court cases which our sister circuit found dispositive as "casual references" deserving "little weight," 851 F.2d at 1141, while overlooking others altogether, is inappropriate.[4]

---

**4.** The panel also asserts that if tribal courts do not have jurisdiction "there will be a jurisdiction void," because state authorities will fail to fill the gap. 851 F.2d at 1146. I find the prediction by a federal court of appeals that state authorities within the circuit will abdicate their responsibility to enforce the criminal law troubling on its face. The states already exercise exclusive jurisdiction over similar offenses (both violent and victimless) committed on the reservation involving solely non-Indian defendants and victims. *See* F. Cohen, *Handbook of Federal Indian Law* 352–53 & n. 47 (1982 ed.). The panel suggests no reason why states would treat crimes by Indian nonmembers differently from the same crimes committed by nonmembers belonging to any other racial group. Any such disparate treatment would violate the equal protection clause of the fourteenth amendment, subjecting state officials to liability under 42 U.S.C. § 1983 (1982). *See Procunier v. Navarette*, 434 U.S. 555, 562, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978) (state officials liable under section 1983 where they know or should know that their conduct violates a clearly established constitutional right); *Smith v. Ross*, 482 F.2d 33,

36 (6th Cir.1973) (per curiam) (law enforcement officers may be liable under section 1983 for failure to enforce the law equally and fairly); *Washington v. Confederated Bands & Tribes of the Yakima Indian Nation*, 439 U.S. 463, 500–01, 99 S.Ct. 740, 761, 58 L.Ed.2d 740 (1979) (states do not share Congress's power to single out Indians in ways "that might otherwise be constitutionally offensive"). The panel cites no support for its proposition.

The far more plausible assumption is that states would exercise their jurisdiction fully and responsibly. Non–Indian residents of reservations apparently outnumber nonmember Indian residents by a substantial margin. Amended Petition for Rehearing and Suggestion of Appropriateness for Rehearing En Banc at 9–10; *see Greywater*, 846 F.2d at 493. The states would therefore experience only a marginal increase in law enforcement responsibilities on the reservation. Moreover, some tribes already restrict their own criminal jurisdiction to tribal members. *See, e.g., Quechan Tribe of Indians v. Rowe*, 531 F.2d 408, 411 & n. 4 (9th Cir.1976) (declining to rule on whether the tribe has inherent power to assert criminal jurisdiction

## B. *Equal Protection*

Another very troubling aspect of the panel's opinion is its handling of Duro's equal protection claim. Duro argues that, by asserting jurisdiction over Indians but not over non-Indians, the tribe has violated the equal protection clause of the Indian Civil Rights Act of 1968 (ICRA), 25 U.S.C. § 1302(8) (1982 & Supp. IV 1986). While a distinction based solely on tribal membership could be sustained on a rational basis alone, Duro contends that the distinction in this case is based on race and does not survive strict scrutiny. The panel rejects this argument and, in doing so, makes two fundamental errors. First, the majority relies on cases holding that *Congress* need not have a compelling governmental interest in enacting statutes that discriminate between Indians and non-Indians in order to survive an equal protection challenge. *See United States v. Antelope,* 430 U.S. 641, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977) (federal jurisdiction over Indian defendants under Major Crimes Act, 18 U.S.C. § 1153); *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (Bureau of Indian Affairs employment preference for enrolled Indians). These cases are inapposite where there is no congressional pronouncement on the issue and the tribe is exercising its retained sovereignty. Second, the panel holds that the classification in question is not racial at all because race is merely one of several factors that go into drawing the distinction at issue. This holding cannot be squared with established principles of equal protection.

The considerations that led the Court to uphold congressional Indian/non-Indian distinctions are irrelevant where, as here, Congress has not acted. The Constitution has been interpreted as granting Congress "plenary power ... to deal with the special problems of Indians." *Mancari,* 417 U.S. at 551, 94 S.Ct. at 2483; *see Antelope,* 430

U.S. at 645, 97 S.Ct. at 1398; U.S. Const. art. I, § 8. Moreover, congressional enactments affording special treatment to Indian tribes and their members are based on a long "history of treaties and the assumption of a 'guardian-ward' status." *Mancari,* 417 U.S. at 551, 94 S.Ct. at 2483. Thus, "[f]ederal regulation of Indian tribes ... is governance of once-sovereign political communities; it is not to be viewed as legislation of a ' "racial" group consisting of "Indians"....' " *Antelope,* 430 U.S. at 646, 97 S.Ct. at 1399 (quoting *Mancari,* 417 U.S. at 553 n. 24, 94 S.Ct. at 2484 n. 24); *see also Mancari,* 417 U.S. at 554, 94 S.Ct. at 2484 (BIA preference "is granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities whose lives and activities are governed by the BIA in a unique fashion"); *Fisher v. District Court,* 424 U.S. 382, 390–91, 96 S.Ct. 943, 948, 47 L.Ed.2d 106 (1976) (exclusive tribal court jurisdiction is based on "quasi-sovereign status" of tribe, not race of party).

When Congress acts, it must reconcile two somewhat inconsistent constitutional provisions: the fifth amendment's implicit guarantee of equal protection and article I, section 8's grant of power to legislate with respect to Indians. The more specific constitutional authorization as to Indians must temper the application of equal protection principles, lest the whole body of federal Indian law be wiped off the books. *Mancari,* 417 U.S. at 552, 94 S.Ct. at 2483; *see id.* at 555, 94 S.Ct. at 2485 (permitting special treatment of Indians so long as it "can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians").

On the other hand, the Court has never held that a *tribe* may exercise its authority in a racially discriminatory manner. As the Court held in *Wheeler,* Indian tribes derive their power to conduct criminal tri-

---

over nonmembers because tribal constitution permits criminal jurisdiction only over members); Cohen, *supra* note 5, at 357 n. 77 ("[o]ther tribes have laws restricting tribal jurisdiction to members"). Presumably some authority steps in to fill the jurisdictional void created in such cases; the states are a logical

choice. *See id.* at 357 n. 79 ("[w]hen a tribe confines its jurisdiction to its own members, state jurisdiction may be correspondingly broader"); *Greywater,* 846 F.2d at 490 n. 3 ("Petitioners were also charged with criminal misdemeanor violations under state law for the offenses arising out of the same incident.").

als not from Congress but from their own retained sovereignty. The two are quite different. Indian tribes may no more discriminate on the basis of race than may a state. *Cf. Washington v. Confederated Bands & Tribes of Yakima Indian Nation,* 439 U.S. 463, 500–01, 99 S.Ct. 740, 761, 58 L.Ed.2d 740 (1979) (states do not share Congress's power to "enact legislation singling out tribal Indians, legislation that might otherwise be constitutionally offensive"). The panel's holding that they may is without precedent or authority.

More disturbing still, the panel holds that the distinction based on Indian status is not a racial classification because factors other than race are taken into account. 851 F.2d at 1144. While this may be true when the distinction is made by *Congress, United States v. Antelope,* 430 U.S. at 645, 97 S.Ct. at 1398, it is most definitely not true when the distinction is made by a tribe. A tribe is a government entity. *See Wheeler,* 435 U.S. at 322–23, 98 S.Ct. at 1085–86. A government entity may not avoid strict scrutiny of a policy that discriminates against blacks, for example, by arguing that race was only one of many considerations. *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 264–66, 97 S.Ct. 555, 562–63, 50 L.Ed. 2d 450 (1977). Either race was considered in the decision, in which case strict scrutiny is invoked, or race was not considered, in which case the rational basis standard applies. You can't have it both ways. In suggesting that government entities may avoid the strict scrutiny of the courts by amalgamating racial classifications with other factors, the opinion takes a giant step backward in equal protection analysis. It is an unwise step, one long foreclosed by the Supreme Court. *See id.* (racially dis-

criminatory factor need not be sole or even dominant concern to invoke strict scrutiny); *see also* L. Tribe, *American Constitutional Law* § 16–14, at 1472 (2d ed. 1988) ("any state or federal action directed at persons of the American Indian race as a racially defined class is subject to strict scrutiny...."). Under strict scrutiny, it is difficult to perceive a state interest so compelling as to force Indians (but not non-Indians) to submit to the criminal jurisdiction of tribes to which they do not belong.[5]

### C. *Potential for Biased Tribunals*

There is yet another troubling aspect of the opinion: its failure to address or even consider the possibility that it may be subjecting Duro to adjudication by a biased tribunal. Judge Sneed, in dissent, gave the subject thoughtful attention. 851 F.2d at 1151–52 (Sneed, J., dissenting). The *Greywater* panel thought the matter significant enough to merit discussion:

> As a final note, we believe our decision is supported by the fact that, based upon the record, there are significant racial, cultural, and legal differences between the Devils Lake Sioux Tribe and the Turtle Mountain Band of Chippewa Indians. These nonmember Indian Petitioners thus face the same fear of discrimination faced by the non-Indian petitioners in *Oliphant:* they would be judged by a court system that precludes their participation, according to the law of a societal state that has been made for others and not for them.

*Greywater,* 846 F.2d at 493. The *Duro* majority ignores the subject.

Indian tribes differ in material respects from political entities to which we are accustomed. They have broad authority to

---

5. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 56, 98 S.Ct. 1670, 1675, 56 L.Ed.2d 106 (1978) suggested that, because tribes are sovereigns pre-existing the Constitution, they may be exempt from constitutional provisions (such as the fifth and fourteenth amendments) limiting the power of federal and state authorities. The equal protection provision of the Indian Civil Rights Act, 25 U.S.C. § 1302(8), however, extends to any person within a tribe's jurisdiction. While ICRA's equal protection clause may not be coextensive with the constitutional equal pro-

tection clause, *Howlett v. Salish & Kootenai Tribes,* 529 F.2d 233, 237 (9th Cir.1976); *Wounded Head v. Tribal Council of the Oglala Sioux Tribe,* 507 F.2d 1079, 1082 (8th Cir.1975), the panel analyzed Duro's equal protection claim under "the implicit equal protection guarantee of the Fifth Amendment," not under ICRA. 851 F.2d at 1144 n. 9. Even under ICRA, however, the majority's equal protection analysis would be erroneous, unless the equal protection offered by ICRA is so insubstantial that *Arlington Heights* would not apply.

determine the qualifications for membership, which often are based on degree of tribal blood. Cohen, *supra* note 5, at 20–23. To be eligible for membership in the Salt River Pima–Maricopa Indian Community, a person must not be a member of another tribe. Salt River Pima–Maricopa Community Const. art. II, § 1; Salt River Pima–Maricopa Community Code § 2–1(a) (Supp. No. 2). As noted, Duro is thus ineligible for membership in the community which will decide his fate. The exclusion of otherwise eligible individuals who belong to another tribe underscores the possibility that those who do not qualify for tribal membership may be treated in an unfair or discriminatory fashion. Indeed, the possibility that there may be hostility or mistrust between Indian tribes is not a far-fetched concern. As reported in testimony given recently before the Civil Rights Commission, at least one such situation currently exists, giving rise to what many perceive as miscarriages of justice:

I am here to address you concerning what I believe are serious violations under the Indian Civil Rights Act of individual Indian people subject to jurisdiction in a variety of situations, but most specifically in the situation where we now have some 15,000 Navajo people who have been placed under the jurisdiction of the Hopi Tribal Court because of [a] land dispute....

It is my personal experience representing people in that tribal court that the relocation situation, the dispute as it exists between the two tribes, makes it impossible for Navajo people who are facing criminal charges as a result of that dispute to be tried fairly in that tribal court.... It is my personal experience that these individuals have experienced a violation of their ... right to trial by impartial jury....

....

I have experienced two recent situations where Indian people, Navajo people, have been charged by the Hopi Tribe and brought into Hopi Tribal Court. We have made motions to dismiss based on the lack of jurisdiction, and we more importantly have raised the question of

an impartial jury. Neither of my clients speaks Hopi; neither of my clients are from the Hopi Tribe; neither are allowed to participate in the Hopi Tribe.

....

... Hopi tribal members who sit on those juries—given the history of the land dispute, there is no way that they can leave that corridor of the courtroom and render a fair and impartial decision when sitting in front of them are people charged with crimes, including resisting that very Hopi Tribe's effort to remove them from their ancestral land.... [We] have people in those courtrooms who have stopped Hopi development projects because the Navajo believe it violates their religious freedom from having burial sites disturbed. They take that right into Hopi Tribal Court and have experienced an absolute vacuum in terms of a forum where they can have those rights impartially reviewed....

*Enforcement of the Indian Civil Rights Act: Hearing Before the United States Commission on Civil Rights* (Aug. 13–14, 1987) at 219–20 (testimony of Lee Brook Phillips, attorney).

This case raises more than a theoretical legal question about which court has jurisdiction; it concerns criminal charges against an individual, Albert Duro. It also concerns other individuals who are or will be in Duro's situation, facing criminal charges in a court made up entirely of people belonging to another tribe, possibly a hostile one. In Judge Sneed's words, the panel's decision will be consigning such individuals "to a tribunal that, on its face, suggests the possibility of prejudice against [them]." 851 F.2d at 1151 (Sneed, J., dissenting).

III

Despite warnings from Judge Sneed's powerful and persuasive dissent, despite the unanimous decision of another circuit, the court today stands by a panel opinion that simply does not do justice to the sensi-

tive and important issues presented to us. I respectfully dissent.