Patrick L. KAHAWAIOLAA,
et al., Plaintiffs,

v.

Gale A. NORTON, in her capacity as Secretary of the Department of the Interior of the United States of America, Defendants.

No. CIV. 01–00817ACKBMK.

United States District Court, D. Hawai'i.

Aug. 30, 2002.

Emmett E. Lee Loy, Honolulu, HI, Walter R. Schoettle, Honolulu, HI, for plaintiffs.

R. Michael Burke, Office of U.S. Atty., Honolulu, HI, for defendant.

## *ORDER GRANTING DEFENDANT'S MOTION TO DISMISS AND DENYING PLAINTIFFS' COUNTER–MOTION FOR SUMMARY JUDGMENT*

KAY, District Judge.

### *BACKGROUND*

This action arises out of an attempt by a group of Native Hawaiians ("Plaintiffs") to have certain regulations promulgated by the defendant Department of Interior ("DOI" or "Defendant") (the DOI is sued through DOI Secretary Gale A. Norton) declared unconstitutional and permanently enjoined. In particular, Plaintiffs object to the regulations at issue because the scope of such regulations exclude Native Hawai-

ians from the universe of indigenous groups that may become federally acknowledged as an "Indian tribe" with all the benefits with respect to that recognition.

Plaintiffs filed their suit on December 11, 2001. Defendant did not file an answer but instead filed a motion to dismiss on March 15, 2002. Plaintiffs filed their opposition to Defendant's motion and filed a counter-motion for summary judgment on March 28, 2002. Defendant filed a reply to Plaintiffs' opposition and an objection to Plaintiffs' motion for summary judgment on April 9, 2002. The Court heard oral arguments on June 10, 2002. During the hearing, the Court instructed the parties to file supplemental papers regarding certain aspects of the procedural background of the case that had not been briefed by the parties.[1] The parties filed their supplemental briefs on July 17, 2002 and replies on August 1, 2002.

### STATUTORY AND REGULATORY BACKGROUND

Plaintiffs' suit implicates the Indian Reorganization Act ("IRA"), the Indian Self–Determination and Education Act ("ISDEA") and the federal acknowledgment regulations. The Court reviews each in turn.

### I. The Indian Reorganization Act

The IRA was passed by Congress in 1934 with "[t]he overriding purpose ... to establish machinery whereby Indian tribes would be able to assume a greater degree of self-government, both politically and economically." *Morton v. Mancari,* 417 U.S. 535, 542, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *The Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 152–154, 93 S.Ct.

1267, 36 L.Ed.2d 114 (1973); *see* 25 U.S.S 461 *et. seq.* The IRA defines "Indian" as:

The term "Indian" as used in [the IRA] shall include all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood. For the purposes of said sections, Eskimos and other aboriginal peoples of Alaska shall be considered Indians. The term "tribe" wherever used in said sections shall be construed to refer to any Indian tribe, organized band, pueblo, or the Indians residing on one reservation. The words "adult Indians" wherever used in said sections shall be construed to refer to Indians who have attained the age of twenty-one years.

25 U.S.C. § 479. Additionally, the IRA "shall not apply to any of the Territories, colonies, or insular possessions of the United States . . . ." The Court notes that when the IRA was passed in 1934, the State of Hawaii was then a territory of the United States. Hawaii was admitted as a state in 1959.

### II. The Indian Self–Determination and Education Act

The ISDEA was passed in 1974 to further strengthen tribal government and interests. 25 U.S.C. § 450 *et. seq.* Congress stated the following policy:

The Congress hereby recognizes the obligation of the United States to respond to the strong expression of the Indian people for self-determination by assur-

---

**1.** In particular, the Court queried whether Plaintiffs had in fact filed with the DOI for federal acknowledgement; and if not, whether Plaintiffs had a duty under the facts of this case to file with the DOI so as to exhaust their administrative remedies; and whether the regulations promulgated by the DOI at issue are legislative or interpretive in nature.

ing maximum Indian participation in the direction of educational as well as other Federal services to Indian communities so as to render such services more responsive to the needs and desires of those communities.

25 U.S.C. § 450a(a). The benefits that proceed from the ISDEA are available to "Indians" who are defined as "a person who is a member of an Indian tribe;" and an "Indian tribe" is further defined as "any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act ... which is recognized as eligible [2] for the special programs and services provided by the United States to Indians because of their status as Indians." 25 U.S.C. § 450b(d), (e).

### III. The Federal Acknowledgment Process

Congress has delegated to the DOI the authority to adopt regulations to administer Indian affairs and to clarify departmental authority by regulation under 25 U.S.C. §§ 2, 9. *See James v. United States Dep't of Health and Human Services*, 824 F.2d 1132, 1137–38 (D.C.Cir.1987). Pursuant to this authority, the DOI has adopted comprehensive regulations that govern its decisions concerning tribal status set out in 25 C.F.R. Part 83 (the "acknowledgment regulations"). This part established procedures by which the DOI acknowledges that certain Indian groups exist as "tribes." *Id.* § 83.2.

The acknowledgment regulations provide that "[a]cknowledgment of tribal existence by the [DOI] is a prerequisite to the protection, services, and benefits of the Federal government available to Indian tribes by virtue of their status as tribes."

*Id.* The regulations apply only to "those American Indian groups indigenous to the continental United States which are not currently acknowledged as Indian tribes by the Department. It is intended to apply to groups that can establish a substantially continuous tribal existence and which have functioned as autonomous entities throughout history until the present." 25 C.F.R. § 83.3(a).

## STANDARDS OF REVIEW

### I. MOTION FOR SUMMARY JUDGMENT

Summary judgment shall be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). The standard for summary adjudication is the same. *See State of Cal. v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998). One of the principal purposes of the summary judgment procedure is to identify and dispose of factually unsupported claims and defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The United States Supreme Court has declared that summary judgment must be granted against a party who fails to demonstrate facts to establish an element essential to his case where that party will bear the burden of proof of that essential element at trial. *See id.* at 322, 106 S.Ct. 2548. "If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact [citations omitted], the non-moving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment." *T.W. Elec.*

---

**2.** The parties agree that in order for Native Hawaiians to benefit under the ISDEA, they must be recognized as eligible as a tribe under the acknowledgment regulations.

*Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987).

Rather, Rule 56(e) requires that the nonmoving party set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial. *See id.* at 630. At least some "significant probative evidence tending to support the complaint" must be produced. *Id.* Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment. *See British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir.1978).

The standard for a grant of summary judgment reflects the standard governing the grant of a directed verdict. *See Eisenberg v. Ins. Co. of North America,* 815 F.2d 1285, 1289 (9th Cir.1987) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, the question is whether "reasonable minds could differ as to the import of the evidence." *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505.

The Ninth Circuit has established that "[n]o longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987). Moreover, the United States Supreme Court has stated that "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Indeed, "if the factual context makes the nonmoving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Franciscan Ceramics,* 818 F.2d at 1468 (emphasis in original) (*citing Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348). Of course, all evidence and inferences to be drawn therefrom must be construed in the light most favorable to the nonmoving party. *See T.W.Elec.Serv.,* 809 F.2d at 630–31.

## II. Motion to Dismiss

██ Under Rule 12(b)(6), in ruling on a motion to dismiss for failure to state a claim upon which relief can be granted, this Court must accept as true the allegations contained in the complaint and view them in a light most favorable to the claimant. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Wileman Bros. & Elliott, Inc. v. Giannini,* 909 F.2d 332, 334 (9th Cir.1990); *Shah v. County of Los Angeles,* 797 F.2d 743, 745 (9th Cir.1986). Thus, the complaint must stand unless it appears beyond doubt that the claimant has alleged no facts that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir.1988). A complaint may be dismissed as a matter of law for two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal theory. *Balistreri,* 901 F.2d at 699; *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 533–34 (9th Cir.1984).

██ A motion under Rule 12(b)(6) should also be granted if an affirmative defense or other bar to relief is apparent from the face of the claim, such as lack of jurisdiction or the statute of limitations. 2A J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice, ¶ 12.07 at 12–68 to 12–69 (2d ed.1991 & supp. 1191–92) (citing *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)) (emphasis added).

## DISCUSSION

Plaintiffs' central challenge is twofold: to Congress' decision as to which groups are eligible to be dealt with on a government-to-government basis, *e.g.*, as a federally recognized tribe; and to the DOI's role in implementing that congressional policy through the acknowledgment regulations.

### A. The Parties' Contentions

Plaintiffs' complaint is premised on the notion that the exclusion of Native Hawaiians flows from unlawful racial discrimination. The gist of Plaintiffs' challenge is as follows: they seek benefits that flow from the ISDEA and the IRA. The ISDEA defines those tribes that are eligible for benefits as those who are "recognized as eligible ... by the United States." 25 U.S.C. § 450b. The IRA's benefits likewise are directed towards Indians, which are defined as "all persons of Indian descent who are members of any recognized tribe now under federal jurisdiction ... and shall further include all other persons of one-half or more Indian blood ...." 25 U.S.C. § 479. Plaintiffs contend that neither of these definitions necessarily exclude Native Hawaiians from the universe of potentially recognizable tribes. Instead, Plaintiffs argue that the acknowledgment regulations except Native Hawaiians from the opportunity to become acknowledged as an Indian Tribe because the regulations limit the potential groups to those within the continental United States[3] and certain Alaskan native groups already acknowledged as tribes. 25 C.F.R. §§ 83.1, 83.3. Thus, unlike the typical challenge in this area where an aggrieved group of Indians seeks recourse in federal court for the DOI's refusal to acknowledge such group as a "tribe;" this matter presents the highly unusual question of whether the DOI's regulations, which result in the disallowance of Native Hawaiian claims of tribal status, are legal. The challenge is not to the DOI's application of its regulations[4] but rather a facial challenge to a portion of them, or more particularly, to their geographic exclusion of the State of Hawaii.[5]

Conversely, Defendant contends that the acknowledgment regulations merely implement Congress' decision to not include Native Hawaiians as an "Indian tribe." Defendant maintains that the Court lacks subject matter jurisdiction over this matter because it involves the political question of whether Plaintiffs, as Native Hawaiians, are entitled to a government-to-government relationship with the United States. Alternatively, Defendant urges that should the Court consider Plaintiffs' claim, it should dismiss Plaintiffs' complaint because the acknowledgment regulations do not deprive Plaintiffs of equal protection under the Fifth Amendment and/or Plaintiffs' action, as a facial challenge to the acknowledgment regulations, is barred by the statute of limitations. Defendant objects to Plaintiffs' summary judgment motion because Plaintiffs failed to conform their motion to the requirements of Local Rule 56.1(a) (failing to file a concise statement of facts). Also, Defendant contends that the matter is not ripe for summary judgment.

Defendant primarily argues that Plaintiffs' complaint is not a matter of equal

---

**3.** The acknowledgment regulations define "continental United States" as the "contiguous 48 states and Alaska." 25 C.F.R. § 83.1.

**4.** The parties informed the Court through the supplemental briefing that Plaintiffs have not applied to the DOI for recognition as an Indian tribe.

**5.** On this basis, the parties agree that Plaintiffs were not under the obligation to exhaust their administrative remedies before commencing this suit.

protection but rather is a dispute that centers on the absence of any decision of Congress to deal with Native Hawaiians on a government-to-government basis (e.g. as a federal recognized Indian tribe).[6] Defendant urges the Court to find that this case raises a political question because it involves the decision not to recognize Native Hawaiians as a potential tribe. Because the DOI primarily maintains that this Court lacks jurisdiction under the political question doctrine, the Court addresses it first.

### B. Legal Standard for Political Questions

■ Federal courts are courts of limited jurisdiction. *Nat'l Indian Youth Council Intermountain Indian Sch. v. Bruce*, 485 F.2d 97, 99 (10th Cir.1973). No presumptions of federal jurisdiction exist. *Id.* The political question doctrine was developed by the landmark case of *Baker v. Carr* as follows:

> It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] or a lack of judicially discoverable and manageable standards for resolving it; [3] or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] or an unusual need for unquestioning adherence to a political decision already made; [6] or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. 186, 218, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *see also* CHARLES ALAN WRIGHT, LAW OF FEDERAL COURTS 84–91 (5th Ed.1994).

The decision to recognize (or not recognize) an Indian tribe is generally regarded as a political question. *See e.g., Baker*, 369 U.S. at 215–17, 82 S.Ct. 691 (identifying cases questioning the status of Indian tribes as representative of political controversies inappropriate for judicial resolution); *Miami Nation*, 255 F.3d at 347 (reasoning that question of whether a tribe constitutes a nation with which the United States might establish government-to-government relations raises political question concerns); *Western Shoshone Business Council v. Babbitt*, 1 F.3d 1052, 1057 (10th Cir.1993) ("The judiciary has historically deferred to executive and legislative determinations of tribal recognition").

■ The prevalence of the political question doctrine within Indian affairs stems, in part, from the constitutional and historical placement of such matters in the exclusive domain of the legislative and executive branches. *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 343, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998) (citations

---

**6.** Defendant's arguments clearly center upon Congress', rather than the Executive's, prerogative with respect to recognizing Indian tribes. Other cases have recognized that the Executive may have authority, independent of congressional grant, to recognize Indian tribes. *See Miami Nation v. U.S. Dep't of Interior*, 255 F.3d 342, 345 (7th Cir.2001) (Judge Posner offering that "nor is it clear that [the acknowledgment regulations] *has* to be authorized by Congress."). In other words, Defendant does not argue that the regulations as written are a manifestation of Executive prerogative, but rather dependent on the instructions of Congress.

omitted) ("Congress possesses plenary power over Indian affairs, including the power to modify or eliminate tribal rights."); Art. I, Section 8, cl. 3. In turn, Congress has delegated management and regulation of Indian affairs to the Executive Branch. 25 U.S.C. §§ 2, 9, 43 U.S.C § 1457; *Zarr v. Barlow*, 800 F.2d 1484, 1489 (9th Cir.1986); *Cherokee Nation of Oklahoma v. Babbitt*, 117 F.3d 1489, 1503 (D.C.Cir.1997); *Miami Nation v. Babbitt*, 887 F.Supp. at 1166–67; *United Shawnee Indians v. United States*, 253 F.3d 543, 549 (10th Cir.2001). Courts exercise deference over such decisions based upon this broad congressional power. *Miami Nation*, 255 F.3d at 345; *Western Shoshone*, 1 F.3d at 1057. Thus the general view is that Congress has the power, both directly and by delegation to the President, to establish the criteria[7] for recognizing a tribe.[8] *Miami Nation*, 255 F.3d at 345.

## C. Application of the Legal Standard

■ Considering the legal framework in evaluating political questions, the Court finds that Plaintiffs' case raises a nonjusticiable political question because their challenge to the regulations surrounding tribal recognition involves matters that have been constitutionally committed to the other branches; and resolution by the Court would show a lack of respect due to the coordinate branches. As noted by the Seventh Circuit in *Miami Nation*, cases such as this one that essentially seek tribal recognition also implicate that aspect of the political question doctrine in which the initial policy determination is of a kind that requires nonjudicial discretion. 255 F.3d at 347.

Although Plaintiffs style their claims as arising under Equal Protection, Plaintiffs' principal dispute is twofold: to Congress' determination as to which groups are eligible to be dealt with on a government-to-government basis, *e.g.*, as a federally recognized tribe; and the DOI's role in executing that congressional policy through the acknowledgment regulations. Adjudication of Plaintiffs' claim would directly place the Court in the shoes of Congress and the Executive Branch in determining whether Native Hawaiians should be recognized and acknowledged as an Indian tribe.

Congress has not yet decided that it will deal with Native Hawaiians groups as political entities on a government-to-government basis.[9] Indeed, Plaintiffs have not

---

7. The difficulty with respect to determining whether Congress or the Executive Branch had recognized a group as a "tribe" was substantially reduced in 1978 when the DOI promulgated the acknowledgment regulations, which govern the federal acknowledgment of Indian tribes. *See generally* 25 C.F.R. Part 83.

8. In *Miami Nation*, Judge Posner addressed the logic of such an understanding of the inter-branch power sharing with respect to acknowledgment of Indian Tribes by noting:
   This makes practical sense [that Congress is assumed to be primary in power over recognizing Indian Tribes]. Congress has passed a number of statutes granting various benefits and immunities to Indian tribes, provided they are recognized by the federal government. E.g. [ISDEA]; Indian

Financing Act of 1975. Naturally and legitimately, Congress is concerned which groups of Indians are given the status of tribes. But the analogy to [executive] recognition of foreign governments has prevailed to the extent that Congress has delegated to the executive branch the power of recognition of Indian tribes without setting forth any criteria to guide the exercise of that power.
   *Id.* (internal citations omitted).

9. Professor Cohen characterized the status of Native Hawaiians under federal Indian law in his treatise as follows:
   Although Native Hawaiians are not ethnically classified as Indians, they are people indigenous to the United States.... However, unlike Indians, or even Eskimos and other Alaskan Natives, they have not been

shown, nor could they show, that Congress has established such relations. Thus, the regulations that Plaintiffs challenge only pertain to those groups with whom Congress has established government-to-government relations. Plaintiffs misconstrue the inquiry at hand: in their challenge to the acknowledgment regulations, they pos-

it that Congress has not specifically disallowed Native Hawaiian qualifications for Indian tribal sovereignty. While this may be true, it is irrelevant to the question of whether Congress has affirmatively entered into a government-to-government relationship, which Plaintiffs cannot show.[10] Thus, the challenged regulations do no

---

dealt with comprehensively by Congress. Only since 1974 has Congress specifically included Native Hawaiians as beneficiaries in bills providing services to Native Americans. Thus, the full extent of the trust obligation owed by the United States to Native Hawaiians and the manner of its fulfillment has not yet been defined. FELIX S. COHEN, HANDBOOK OF FEDERAL INDIAN LAW at 797–98 (Rennard Strickland ed.1982) (hereinafter "COHEN"). Similarly, the Supreme Court in the recent *Rice* decision specifically avoided deciding whether Congress had determined whether Native Hawaiians could be treated like Indians. *Rice*, 528 U.S. at 518–19, 120 S.Ct. 1044 ("It is a matter of some dispute, for instance, whether Congress may treat the native Hawaiians as it does the Indian tribes. We can stay far off that difficult terrain.") (citations omitted). Indeed, the Ninth Circuit has even held, in another statutory context, that the term "Indian" applies to the "the aborigines of America." *Pence v. Kleppe*, 529 F.2d 135, 139 n. 4 (9th Cir.1976).

10. Plaintiffs also argue that the definitions of "Indian" and "Tribe" in the IRA do not *exclude* Native Hawaiians so they may *include* Native Hawaiians. The Court disagrees. First, the definition of "Indian" within the IRA states that it "include[s] all persons of Indian descent *who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934 ... and shall further include all other persons of one-half or more Indian blood.*" 25 U.S.C. § 479 (emphasis added). This definition was intended to preserve the status quo with respect to whom should be considered an Indian. Representative Edgar Howard, who cosponsored the IRA with Senator Burton Wheeler, made the following statements during the congressional debate regarding whom should be classed as an "Indian:"

For purposes of this act, [the definitional section] defines the persons who shall be classed as Indian. *In essence, it recognizes*

*the status quo of the present reservation Indians and further includes all other persons of one-fourth Indian blood.* The latter provision is intended to prevent persons of less than one-fourth Indian blood who are already enrolled members of a tribe or descendants of such members living on a reservation from claiming financial and other benefits of the act. Obviously the line must be drawn somewhere ...

Congressional Debate on Wheeler–Howard Bill (1934) *in* THE AMERICAN INDIAN AND THE UNITED STATES, Vol. III. (Random House 1973) (emphasis added) (the Court notes that the one-fourth Indian blood requirement, referenced above by Representative Howard, was subsequently altered in the statute to require a one-half Indian blood quantum). Several other factors within the purpose and history of the IRA make it abundantly clear that Native Hawaiians were not intended to be considered "Indians." First, the IRA was passed primarily to remedy the failed prior Indian policy of land allotment and increasing levels of Indian alienation of land. S.Rep. No. 1080 73d Cong (1934). The Supreme Court in *Brendale v. Confederated Yakima Indian Nation*, 492 U.S. 408, 436 n. 1, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989) recognized that the IRA was passed specifically to address the failed allotment policy and to remedy the loss of over 90 million acres of Indian land. Hawaii, either as a State or U.S. territory, never had a reservation program. Second, Plaintiffs ignore that aspect of the congressionally defined scope of the IRA's definition of an Indian in which Congress intended to extend the provisions of the IRA to the aboriginal people of Alaska (then a territory) but not to the aboriginal people of Hawaii. Such exclusion, at the very least, demonstrates Congress' intent to not enter a government-to-government relationship with Native Hawaiians in 1934. The Ninth Circuit in *Price* considered in dicta, without deciding, whether Hawaii's interceding admission to statehood may have altered the definition of Indian within the IRA with respect to Native Hawaiians. *Price*, 764

more than effectuate congressional policy with respect to Native Hawaiians in the sense that Congress has not, as of yet, decided to enter a government-to-government relationship.

The Court also notes that while it proceeds with caution in construing legislative silence, it cannot ignore that Congress is keenly aware of the acknowledgment regulations and their exclusion of Native Hawaiians, yet has chosen not to act. *Cf. United Houma Nat. v. Babbit*, No. Civ. A. 96–2095(JHG) 1997 WL 403425 at *8 (D.D.C. July 8, 1997). This congressional inaction manifests especial import when coupled with Congress' other statutes dealing with Native Hawaiians [11] and/or pending bills that would create a government-to-government relationship.[12]

The Court likewise appreciates the Executive Branch's ample authority to recognize tribes, and that such determination of tribal status has long been regarded as a political question inappropriate for judicial review. *See, e.g., United States v. Holliday*, 70 U.S. 407, 419, 3 Wall. 407, 18 L.Ed. 182 (1865) ("In reference to all matters of [Indian affairs], it is the rule of this court to follow the action of the executive and other political departments of the government...."); *James*, 824 F.2d at 1137; *Baker*, 369 U.S. at 215–17, 82 S.Ct. 691 (identifying status of Indian tribes as "representative" of political question); *Western Shoshone*, 1 F.3d at 1057 ("The judiciary has historically deferred to executive and legislative determinations of tribal recognition"); *Price v. State of Hawaii*, 764 F.2d 623, 628 (9th Cir.1985) (offering reluctance "to intrude on the traditionally executive or legislative prerogative of recognizing a tribe's existence"). In addition to Plaintiffs' inability to show congressional recognition, Plaintiffs fail to show any prior Executive tribal recognition of Native Hawaiians.[13]

---

F.2d at 626. The Court notes that *Price's* dictum does not provide an answer to the specific question raised in this case. Commentaries on the legislative history also confirm that Native Hawaiians were not included within the definition of Indian. Professor Elmer Rusco writes regarding the definitional section that the IRA applies to all persons of Indian descent who are members of any recognized tribe under federal recognition as of June 1, 1934 and thus, "many descendants of aboriginal societies, *including native Hawaiians*, are not legally defined as Indians to this day." ELMER RUSCO, A FATEFUL TIME. THE BACKGROUND AND LEGISLATIVE HISTORY OF THE IRA 267 (UNLV Press 2000) (emphasis added).

**11.** A number of laws have been passed for the benefit of Native Hawaiians. *See, e.g.,* Hawaiian Homes Act, 42 Stat. 108 (1921).

**12.** A bill known as the Akaka Bill was introduced by the Hawaiian congressional delegation during the 106th Congress that would create a government-to-government relationship between Native Hawaiians and the federal government similar to that between mainland Indian tribes and the federal government. S.Res. 746, 107th Cong. (2001). The bill is still pending, and would appear to be the course of action to pursue in order to achieve federal recognition of a "Native Hawaiian governing entity." *Id.*

**13.** Indeed, Plaintiffs' reliance upon a report prepared by the DOI and Department of Justice in October 2000 that dealt at length with the political status of Native Hawaiians demonstrates, contrary to Plaintiffs' position, that recognition of Native Hawaiians clearly is a political issue requiring a political response. *From Mauka to Makai: The River of Justice Must Flow Freely*, Report on the Reconciliation Process Between the Federal Government and Native Hawaiians (Oct. 23, 2000) (the "Report"). In particular, the Report first recognizes the absence of a current government-to-government relationship: indicating that "[t]his reconciliation process should ultimately result in congressional confirmation of a political, government-to-government relationship between Native Hawaiians and the Federal Government pursuant to Congress' plenary power over Indian Affairs." Report at ii. Further, the Report recommended that "Congress should enact further legislation to clarify Native Hawaiians' political status and to create a framework for recognizing a government-to-government relationship with a

The Seventh Circuit recently addressed the political question doctrine in the Indian context. *Miami Nation*, 255 F.3d at 347–48. The court observed that the recognition of tribal status implicates that element of the political question doctrine "which focuses on the nature of the questions that the court would have to answer—which asks whether the answers would be ones a federal court could give without ceasing to be a court, ones within the cognitive competence, as distinct from the authority, of federal judges—is engaged by such a dispute." *Miami Nation*, 255 F.3d at 347. There, the court held that the Indiana Miami's challenge to the DOI's application of the regulatory criteria was the type of controversy amenable to judicial review. *Id.* The Seventh Circuit, however, further opined:

> [I]f two residents of what was once the Kingdom of the Two Sicilies asked a federal court to recognize it as an independent nation, the court would invoke *Luther v. Borden* [48 U.S. (7 How.) 1, 12 L.Ed. 581 (1849)] and tell them to take it up with the State Department. The question of whether the [group of Native Americans suing for relief] constitutes a "nation" with a "government" with which the United States might establish relations is similar. It comes as no surprise, therefore, that "the action of the federal government in recognizing or failing to recognize a tribe has traditionally been held to be a political one not subject to judicial review."

*Id.* at 347 *citing* WILLIAM C. CANBY, JR., AMERICAN INDIAN LAW IN A NUTSHELL 5 (3d Ed.1998) (hereinafter "CANBY"); *Holliday*, 70 U.S. at 419, 3 Wall. 407; *Cherokee Nat. of Oklahoma v. Babbitt*, 117 F.3d 1489, 1496 (D.C.Cir.1997); *Western Shoshone*, 1 F.3d at 1057; COHEN at 3–4.

Here, Plaintiffs' case clearly raises the concerns that the Seventh Circuit in *Mia-mi Nation* noted in admonitory terms. The instant case is not a matter in which the Court is asked to review the grant or denial of tribal recognition under the Administrative Procedure Act to determine whether the DOI followed its own regulations. *See Miami Nation*, 255 F.3d at 348–49; CANBY at 5. Instead, Plaintiffs' arguments present a nonjusticiable matter because they ask the Court to supplant Congress' decision not to deal with Native Hawaiians as an Indian tribe. Indeed, Plaintiffs ask this Court in their complaint to enjoin the DOI from enforcing the acknowledgment regulations in a manner that excludes Native Hawaiians from the benefits and protections of the IRA and ISDEA. This request is a political one; and it is not subject to judicial review. In the words of the Supreme Court:

> [T]he questions whether, to what extent and for what time [Native Americans] shall be recognized and dealt with as dependent tribes requiring the guardianship and protection of the United States are to be determined by Congress, and not by the courts.

*United States v. Sandoval*, 231 U.S. 28, 46, 34 S.Ct. 1, 58 L.Ed. 107 (1913).

The Court duly considered Plaintiffs' characterization of their claim as consisting only of the request for the opportunity to apply to be acknowledged versus asking for acknowledgment outright. Despite Plaintiffs' portrayal of their relief; their requested relief necessarily involves the Court in deciding whether the DOI, and Congress, have inappropriately excluded Native Hawaiians from tribal recognition. As such, the Court lacks jurisdiction to judge the propriety of Congress' decision to not, as of yet, recognize Native Hawaiians as an Indian tribe.

representative Native Hawaiian governing body." Report at 17.

Accordingly, the Court GRANTS Defendant's motion to dismiss Plaintiffs' complaint because it raises a political question and therefore the Court does not reach Defendant's remaining arguments advanced in support of dismissal. For this reason, the Court DENIES Plaintiffs' counter-motion for summary judgment.[14]

**14.** Notwithstanding that the Court finds that this matter is nonjusticiable, the Court finds that the acknowledgment regulations, even if subject to a justiciable challenge, do not violate the Fifth Amendment. Plaintiffs do not challenge, at least directly, the classification of "Indian" embodied in the ISDEA or IRA; rather, as discussed earlier, they challenge the acknowledgment regulations' exclusion of Native Hawaiians as unlawful racial discrimination violative of the equal protection component of the Fifth Amendment.

The appropriate standard of review for Plaintiffs' constitutional challenge to these regulations, if justiciable, would be the rational basis standard. *Morton v. Mancari,* 417 U.S. 535, 555, 94 S.Ct. 2474, 41 L.Ed.2d 290 ("As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed."); *United States v. Nuesca,* 945 F.2d 254, 257 (9th Cir.1991) (rejecting strict scrutiny review in equal protection challenge by Native Hawaiians based upon differential treatment of Alaskan tribes); *Duro v. Reina,* 860 F.2d 1463, 1467 (9th Cir.1988) (discussing rational basis standard for Indian preferences). Moreover, utilization of the rational basis standard to review Indian laws and regulations is well established. *Morton,* 417 U.S. at 554–55, 94 S.Ct. 2474; *United States v. Antelope,* 430 U.S. 641, 645–46, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977); *U.S. v. Male Juvenile,* 280 F.3d 1008, 1016 (9th Cir.2002) (finding no equal protection violation to exist "because the difference in treatment [under the challenged statute] between an Indian and a non-Indian arises from his political membership in the tribe rather than from his race.") (citations omitted); *Narragansett Indian Tribe v. Nat. Indian Gaming Comm'n,* 158 F.3d 1335, 1339–41 (D.C.Cir.1998).

In *Morton,* the Supreme Court evaluated an Indian employment preference and rejected the challenger's argument that the Indian preference constituted illegal racial discrimi-

## CONCLUSION

For the foregoing reasons, the Court GRANTS the Defendant's motion to dismiss and DENIES Plaintiffs' counter-motion for summary judgment. Again, it would appear that the course of action to achieve a government-to-government relationship between Native Hawaiians and

nation or even preferential treatment. 417 U.S. at 553–54, 94 S.Ct. 2474; COHEN at 19 ("In dealing with Indians, the federal government is dealing with members or descendants of political entities, that is, Indian tribes, not with persons of a particular race"). Instead, the Court, which recognized Congress' plenary power with respect to Indian affairs, upheld the preference because it served the cause of Indian self-government.

*Morton's* analysis applies here with equal force. First, the statutory schemes embodied in IRA and ISDEA, which are not directly challenged by Plaintiffs, are legitimate expressions of congressional prerogative to legislate on behalf of Indians. Those schemes, for the reasons stated below, pass muster under rational basis review. *See, e.g., Nuesca,* 945 F.2d at 257 (rejecting equal protection challenge, under rational basis review, by Native Hawaiians seeking similar fishing rights as Alaskan tribes under environmental laws). These statutory schemes relate to the protection, services and benefits that Congress extends to federally recognized tribes and the acknowledgment regulations rationally relate to the congressional prerogative to limit the benefits of Indian-based legislation to only those Indian tribes that are recognized as such. These regulations were issued pursuant to the Secretary's general statutory power delegated by Congress. 25 U.S.C. §§ 1, 9. Because Congress has not entered into a government-to-government relationship with Native Hawaiians, it is entirely rational for the Secretary to exclude Hawaii from the scope of the acknowledgment regulations. Indeed, the Ninth Circuit in *Price* commented directly upon these regulations, and the particular complained of section and made no mention whatsoever of any constitutional infirmity. *Price,* 764 F.2d at 626–27. Moreover, a number of other courts have considered these regulations and rejected challenges made to them. *See James,* 824 F.2d at 1132; *Western Shoshone,* 1 F.3d at 1058.

the federal government would be to pursue the pending Akaka Bill.

IT IS SO ORDERED.